**Donna COUSINS and Rick James, Plaintiffs,**

**v.**

**Robert BRAY and Lisa Bray, Defendants.**

**No. 2:03–cv–1071.**

United States District Court, S.D. Ohio, Eastern Division.

Dec. 30, 2003.

---

Alexander Morris Spater, Columbus, OH, for Plaintiffs.

D. Wesley Newhouse, II, Barbara Kozar Letcher, Lane, Alton & Horst–2 Columbus, OH, for Defendants.

### *OPINION AND ORDER*

MARBLEY, District Judge.

## I. INTRODUCTION

This matter is before the Court on Plaintiffs' Motion for a Preliminary Injunction. On November 21, 2003, pursuant to Local Rule 65.1, a hearing was held on Plaintiffs' Motion for a Temporary Restraining Order against Defendants, Robert Bray and Lisa Bray. Following the hearing, the Court granted the Temporary Restraining Order. On December 9 and December 11, 2003, this Court held a preliminary injunction hearing. Based on the arguments of counsel and the evidence presented at the hearing, the Court hereby **GRANTS** Plaintiffs' Motion for a Preliminary Injunction.

## II. FACTS AND PROCEDURAL HISTORY

Pursuant to an oral agreement, Defendants, Robert and Lisa Bray, are currently renting to Plaintiffs, Donna Cousins and Rick James, a single family home located at 9395 Upper Twin Road, South Salem, Ohio.[1] On October 23, 2003, Lisa Bray personally delivered to Donna Cousins a three-day notice to vacate. The notice to vacate stated that if Plaintiffs did not vacate the premises by October 30, 2003, an eviction action might be initiated against them. Though the form contained several lines for "Grounds," these lines were left blank. Nowhere on the form was any reason provided for the notice. On October 31, 2003, Lisa Bray taped to Plaintiffs' door a letter from Rebecca E. Cook, an attorney purporting to represent the Brays. According to the letter, Plaintiffs were in arrears on their rental obligation. If they failed to vacate the premises,[2] an action in Forcible Entry would be filed against them in the Chillicothe Municipal Court requesting that they be evicted from the premises and requesting restitution for unpaid rent. On November 3, 2003, Lisa Bray taped to Plaintiffs' door a notice to terminate the tenancy. According to that notice, if Cousins and James did not move out by December 3, 2003, the Brays would evict them. The notice did not contain any statement as to the grounds for the termination.

In a Complaint and Motion for Temporary Restraining Order filed November 21, 2003, Plaintiffs contend that the attempt to evict them is impermissibly based on racial discrimination in violation of the 1968 Fair

---

1. Defendants rent a number of other houses and lots. For the purpose of this Opinion and Order, the Court assumes that Defendants do not fall within an exception to the federal Fair Housing Act, 42 U.S.C. §§ 3601 et seq.

2. The letter contained a blank for the date by which Plaintiffs needed to vacate the premises. In this blank was written "10–3–03." Mrs. Bray testified that she entered that date, which she mistakenly wrote as October 3 even though she meant December 3.

Housing Act, 42 U.S.C. §§ 3601 et seq.; 42 U.S.C. § 1982; and section 4112.02(H) of the Ohio Revised Code. Specifically, though both Cousins and James, like Defendants, are white, Plaintiffs claim that Defendants' actions resulted from Defendants' discovery that Cousins has two biracial sons, both of whom were at some point living at the premises with Cousins and James. On November 21, 2003, following a conference held pursuant to Local Rule 65.1, the Court granted Plaintiffs' Motion for a Temporary Restraining Order.[3]

At a hearing on Plaintiffs' Motion for a Preliminary Injunction held December 9 and 11, 2003, Defendants contested virtually all of the facts presented by Plaintiffs. Defendants contend that they took steps to evict Cousins and James, not because of the race of Cousins' sons, but because (1) they suspected Cousins and James of stealing from them; (2) they were concerned about the condition of the rented property, particularly as a result of Plaintiffs' dogs; and (3) James was telling lies about Mrs. Bray.

## A. The Facts Presented by Plaintiffs

Plaintiffs set forth the following scenario, primarily through the testimony of Donna Cousins, Rick James, Sharrie Pierce, and Kenny Yoakem. Plaintiffs' witnesses testified substantially in accord with each other. In July 2003, Cousins and James were looking for a new place to live since Cousins had declared bankruptcy and her home was about to be foreclosed. Through Sharrie Pierce, James' sister, Cousins and James learned about the house at 9395 Upper Twin Road that the

Brays were seeking to rent. Pierce lived next door to the house and was acquainted with the Brays. Pierce's boyfriend, Kenny Yoakem, was employed by Robert Bray at his logging business, Robert Bray Logging, which was located directly behind the rental house.

Sometime in July 2003, Mr. Bray told Yoakem to have Cousins and James come see him to discuss renting the house. Yoakem informed Pierce, who then called Cousins and James. Cousins and James drove to the house that evening. Cousins and James, along with Pierce, went to Robert Bray's shop to speak to him about renting the house. At the time, Mr. Bray and some of his employees were working on repairing a piece of equipment, and Mr. Bray seemed preoccupied. Not much was discussed at this meeting, but Mr. Bray told Cousins he would keep her and James in mind. Cousins told Mr. Bray about Plaintiffs' dog, and Mr. Bray did not have a negative response.

A few days later, the Brays stopped by Pierce's home and told Pierce to call her brother if he was still interested in the house. Again, Cousins and James drove to the house that evening. Mr. Bray showed them the house. Cousins told Mr. Bray about her two sons, but her sons were not present and she made no mention of their race. The cabinets in the kitchen needed to be replaced; Mr. Bray said he would be willing to waive the security deposit if James would install cabinets that Mr. Bray purchased for the kitchen. James agreed to Bray's proposition. Mr.

---

**3.** This matter was initially set for a preliminary injunction hearing on December 1, 2003, and the Temporary Restraining Order was to expire at 5:00 p.m. on that date. On the date of the hearing, Defendants appeared but were unrepresented by counsel. The Court continued the hearing until December 9, 2003, in order to allow Defendants an opportunity to

retain counsel. The Court extended the Temporary Restraining Order until the hearing date. At the conclusion of the preliminary injunction hearing, Defendants stipulated to an extension of the Temporary Restraining Order until the issuance of the Court's Opinion on the Motion for Preliminary Injunction.

Bray also asked James if he would be willing to keep an eye on the property; James agreed. Cousins and James asked Mr. Bray about their dog, which they informed him was an inside dog and assured him was housebroken and sanitary. Mr. Bray said that the dog would be no problem so long as it did not mess up the house. Rent was set at $300 per month. Included with the rent was the house itself, a fenced-in yard, access to both a front driveway and a rear driveway,[4] and use of a small garage. Also on the property, catercorner to the house, is a medium-sized garage. Directly behind the house is a very large garage that houses two businesses: Robert Bray Logging and Ben Mason Trucking. A large driveway that goes past the house provides the only access to this large garage from the road.

Cousins and James began moving their things into the house and working on repairs in July 2003, but they were to begin paying rent on August 1. On August 1, 2003, they moved in full-time. Cousins' sons, James Harding, age 26, and LeeMan Brown, age 16, did not move in with Cousins and James until the first week of September, though they were present at the house before that time, mowing the lawn and performing other chores. Before the first week of September, Harding and Brown were staying in Cousins' old house so that it would not be vacant before the foreclosure auction.

Relations between Plaintiffs and Defendants were not problematic until the middle or the latter part of October. Plaintiffs paid their August rent on August 1. On September 6 or 7, James took the September rent to Mr. Bray in his shop after the Brays returned from vacation. In October, Plaintiffs paid their rent in the middle of the month, when Lisa Bray came to their house to collect it.[5]

In approximately the first week of August, Mr. Bray explained to James that he did not have general use of the medium-sized garage on the property, but that he could use the lumber in that garage. Around the same time, James asked for, and received, permission to store his motorcycle in the medium-sized garage. In late August 2003, Robert Bray was driving past while James, Pierce, and Yoakem were conversing in the yard of the rented house. Mr. Bray pulled up, and the conversation turned to the onset of cold weather. Mr. Bray asked James if he had had the fuel tank filled for the house, and James responded that he had not done it yet because he and Cousins did not have enough money. Mr. Bray assured James that it was no problem and told him he could have a fuel-truck driver on his way to or from Bray's business fill the tank. The oil could be charged to Mr. Bray, then James and Cousins could pay Bray when they got the money.[6] In accordance with Mr. Bray's instructions, James subsequently had a driver for Mid–Ohio Oil fill the house fuel tank.

On October 15 or 16, 2003, Mr. Bray asked James if he knew who had been using his lumber. James responded that he had been using it. Mr. Bray replied that he did not know James had been using that much, and that he would prefer James to use no more.

James testified that the members of his household almost always used the rear driveway and the back door of the house because a sidewalk led from the rear driveway to the back door, providing their only means to enter the house without muddy feet.

5. Cousins explained at the hearing that the rent was late because Mr. Bray had told them that Mrs. Bray would come to collect the rent each month.

6. Yoakem corroborated the substance of this conversation.

When Mr. Bray received the bill for the fuel oil that James had had pumped into the house tank, he took it to Plaintiffs' house. They told him that they would not have the money until the following Wednesday, when Cousins got paid. The following Wednesday, October 22, Lisa Bray came to the house to collect the money for the fuel oil. Plaintiffs informed Mrs. Bray that they did not have all the money. Mrs. Bray asked how much they did have and agreed to accept $140 if they would pay the remaining $40 on Friday, October 24, after James received his unemployment compensation check. While at Plaintiffs' house, Mrs. Bray went into the living room. There are pictures of Cousins' sons in the living room.

On Thursday, October 23, Mrs. Bray delivered to Cousins the three-day notice to vacate. Mrs. Bray was visibly upset, told Cousins she wanted them to leave, and said she was tired of "all the lies." Mrs. Bray refused to elaborate to Cousins on the "lies." Mrs. Bray said Mr. Bray wanted her to look at the carpet in the house; Cousins allowed Mrs. Bray to walk around the house and do so. Cousins, also upset, called James' father's shop in Chillicothe as soon as Mrs. Bray left. Sharrie Pierce answered the phone at her father's shop and attempted to calm Cousins. Having heard about the notice from Cousins, Pierce, that evening, called Mrs. Bray. Mrs. Bray informed Pierce that she had gone to the house to collect money for the fuel oil that James had put in the fuel tank with Mr. Bray's permission. While at the house, she walked around and looked at the carpet. Mrs. Bray told Pierce that she

"didn't realize that they had two black boys." Mrs. Bray talked about things being missing and suspicions that Cousins and James were stealing. She also said that she was "tired of the lies" and that she wanted them out of the house. Bray referred to the "thieving niggers" living in the house. Pierce asked Mrs. Bray to reconsider; Mrs. Bray replied that it was up to her husband.

On Friday, October 24, James took the remaining $40 owed on the fuel oil, along with a handwritten note addressed to Mr. and Mrs. Bray, and left them on the desk in Mr. Bray's shop. In the note, James apologized to the Brays for having "embelished [sic] and exaggerated a story about Lisa coming over here & made things up about what was said." According to James, when Mrs. Bray came to collect the money for the fuel oil on October 22, she was "demanding but not really harsh." After Mrs. Bray left their house, however, he told Kenny Yoakem that Mrs. Bray had been ranting, cursing, and accusing Cousins and James of not maintaining the house. James said these things to Yoakem knowing they were not true because someone had been talking about Plaintiffs, saying, for example, that they were not taking care of the house.[7] James figured if the falsehood he told Yoakem was passed along to the Brays or anyone else, then he would know that Yoakem was the person spreading stories about James and Cousins.

On October 28, 2003, Kenny Yoakem, Pierce's boyfriend and an employee of Mr. Bray's, was at a work site with Bray and several other employees. Since sometime

---

7. On cross-examination, James denied that any of the rumors up to that point involved any comments about the race of Cousins' sons and denied that any of the embellishments he provided to Yoakem involved racial comments made by Mrs. Bray. He stated that the rumors regarding Plaintiffs involved them not taking care of the house and the property and their dog making a mess. Later in the cross-examination, though, James seemed to recant, at least in part. He continued to deny that he had invented any racial comments but seemed to agree that some of the previous rumors involved the race of Cousins' sons.

in October, Mr. Bray had been making comments to Yoakem regarding Cousins' biracial children. For example, Bray frequently referred to them as niggers, Afros, and hucklebucks and stated that he wanted the niggers out of his house. Mr. Bray also told Yoakem that the next time he hired someone, he was going to check the employee's family tree. Yoakem understood this comment to be a reference to Mr. Bray's aversion to black people. Mr. Bray on numerous occasions asked Yoakem how many hucklebucks he had in his family. On October 28, 2003, Yoakem observed Mr. Bray whisper something to another employee. The other employee then turned to Yoakem and asked him how many he had. Based on Bray's previous comments, Yoakem understood this statement as asking how many African-Americans he had in his family and as referring to Cousins' children. Yoakem responded to Mr. Bray, telling him he did not want to hear any more comments like that about his family. Mr. Bray then replied, "You're ... fired."

On November 3, 2003, Plaintiffs attempted to pay their November rent by placing a money order for $300 in the Brays' mailbox. That same evening, Robert Bray came to Plaintiffs' house to return the rent money. He came up to the front door alone. When Plaintiffs answered the door, Mr. Bray took the money order out of the envelope, handed it back to them, and said, "I don't want your money; I want your ... niggers out of my house."

Beginning around the third week of October, Plaintiffs perceived a series of harassing and/or intimidating actions by Mr. Bray. While Mr. Bray's business had always created some amount of noise, both Pierce and James testified that, after living in proximity to the business for awhile, they were able to ignore most of the noise. Beginning sometime after mid-October, however, a phenomenal amount of noise began to be directed toward Cousins and James' house. Pierce, Yoakem, Cousins, and James all testified as to the increased noise, especially early in the morning and late at night. According to Pierce, drivers began using the jake brake, which made a roaring noise, on their way out of the driveway coming from Mr. Bray's business. The drivers also would blow their air horns and cause their tires to squeal. Yoakem testified that Robert Bray's truck would pull up in the driveway between Pierce's house and Cousins and James' house, where the driver would rev the motor and apply the jake brake. Yoakem also commented that, on at least one occasion, the loaders were running after 11:00 p.m. According to James, the logging trucks began to use their jake brakes in the driveway by Plaintiffs' house. The trucks would sit directly next to the house, and the drivers would rev their engines and apply their jake brakes. This sort of incident occurred daily for two to three weeks. Plaintiffs would hear the air horns of the semi-trucks and the horns of personal vehicles, and they would see the lights of the trucks shining into their home. Cousins noted that Mr. Bray, on at least one occasion, pulled his truck up by the window and stared into the house for a long period of time. Mr. Bray also caused his big truck to make very loud noises, to bounce around, and to throw up gravel. Cousins testified that there is a fair distance between where Mr. Bray was stopping and the road, and that he never stopped there before the middle of October.

Around October 17 or 18, Cousins and James came home to discover that the rear driveway to their house had been blocked

off by several long logs.[8] Also in mid– to late-October, James came home one evening to discover that his motorcycle had been removed from the medium-sized garage and locked out. James testified that, on a daily basis, the gate to Plaintiffs' fenced-in yard was opened, allowing Plaintiffs' dog to escape. Cousins stated that she had seen Mr. Bray open the gate and leave it open. On November 28, 2003, James was outside at his father's shop. He heard a jake brake and heard someone, in a voice that sounded like Robert Bray's, shout, "Nigger lover motherfucker." Cousins testified that when she has been home alone, Mr. Bray has walked around in the yard.

James, Cousins, and Cousins' younger son, LeeMan Brown, all testified that Mr. Bray has intimidated them and that they feel threatened by him. Cousins' older son, James Harding, moved out around November 6.[9] James noted that it is unnerving and very unsettling when Mr. Bray stops his truck near the house at a strange angle, shines his lights into the house, stares at the house, and revs his engine very early in the morning. Cousins testified that she is aware of violent altercations Mr. Bray has had with members of his family. This knowledge, coupled with Mr. Bray's recent activities, cause her to be afraid of Mr. Bray. She no longer allows her sons to remain at the house if she is not there, and the stress of the entire situation has affected her at work. Brown testified as to an occasion in late November 2003 when Mr. Bray stared at him for several minutes. Brown stated that he was afraid and thought Mr. Bray might do something. Plaintiffs both testified that they would like to remain in the house if the intimidation were to stop, because it is

otherwise a good place to live. Cousins stated that having to move would create grave financial difficulties for the household, since they have nowhere to go and no financial means to move.

## B. The Facts Presented by Defendants

The Defendants presented the following facts, primarily through the testimony of Robert Bray and Lisa Bray. Several other witnesses corroborated various points or testified on tangential issues. Each defense witness testified substantially in accord with all the others. Defendants first became aware of Cousins and James through Pierce and Yoakem, who encouraged Mr. Bray to rent to them. On the day Cousins and James came to his shop to inquire about renting the house, Mr. Bray was not expecting them, and was, in fact, occupied, with some other people, in fixing a piece of machinery. Mr. Bray informed Cousins and James that he was not yet sure what he and Mrs. Bray were doing with the house. According to Bray, Cousins' son LeeMan Brown was present, along with Cousins, James, and Pierce, in his shop that day. Tony McCombs, a current employee of Ben Mason's and a former employee of Robert Bray's, corroborated this testimony.

Perhaps a month after the first conversation, Mr. Bray told Yoakem to tell Pierce that if her brother still wanted to rent the house, he should come see Bray. At the second meeting with Cousins and James, Mr. Bray showed them the house. Mr. Bray initially sought $350 in rent but agreed to $300 on the condition that Plaintiffs keep an eye on his business. Mr. Bray testified that he normally obtains a security deposit, but since Plaintiffs told him they had no money, he allowed them

---

8. Robert Bray admitted, on cross-examination, that he had put the logs in the driveway. He offered no explanation for this action.

9. In his testimony, Mr. Bray contended that Harding is still living in the house.

to install new kitchen cabinets in lieu of providing a security deposit. The rent included the house itself and one small garage.

Defendants did not require Plaintiffs to pay rent for the second half of July. Plaintiffs' August rent was 15 days late. Plaintiffs' September rent was seven or eight days late. Their October rent was late, and Mrs. Bray had to tell them that she would not come to collect the rent, but that they were responsible for bringing it to her on the first of the month. Defendants do admit that Plaintiffs eventually paid their rent in full for August, September, and October.

After Plaintiffs moved in, Mr. Bray started noticing various items missing from around his shop.[10] He eventually came to suspect Plaintiffs.[11] Mr. Bray noticed a large amount of fuel missing from his tanks. Bray discovered the theft when the fuel company called, either before or while Bray was on vacation sometime in the late summer, to ask why the amount of fuel used had increased so dramatically. Rusty Reynolds, an employee of Robert Bray's, also testified that, while the Brays were on vacation in July, the fuel company filled the 3,000–gallon tanks on a Monday, yet when Reynolds went to get fuel on the following Wednesday, the tanks were empty. Reynolds reported this unusual occurrence to Mr. Bray. Ben Mason, who owns the business that shares space with Mr. Bray's company, similarly testified that he had a shortage of gas in his tanks, and that he informed Mr. Bray of this issue. Certain tools were also found to be missing. For example, Ben Mason testified that, in August and September 2003, he noticed several hand and power tools missing. Again, he spoke with Mr. Bray about the problem.

Mr. Bray testified that he had kept certain lumber in the medium-sized garage for three years, using it as needed. When he stopped into the garage one day, he noticed half of it was missing. Bray asked James if he knew who had taken the lumber, and James admitted to having taken it and used it in the house. Bray testified that he had never given James permission to use any of the lumber; in fact, he reported the theft of the lumber to the police. Additionally, Mr. Bray loaned James his motor puller and had to ask for it back before it was returned.[12] Mr. Bray received various reports from employees and friends that James was around the shop even though he had no reason to be.[13] These reports were, in large part, the basis for his suspicion that James was stealing from the shop. At the very least, the

---

10. Yoakem, testifying on behalf of Plaintiffs, noted that Mr. Bray had had a problem with items being stolen even before Plaintiffs moved in.

11. James acknowledged, both on cross-examination and in his handwritten note to the Brays, that he knew the Brays suspected him of stealing.

12. James admitted that he did not return the motor puller after borrowing it. He stated that he did not want to be seen around Mr. Bray's business at that point, because he thought he might be further accused of stealing. James testified that he had no intention

of keeping the motor puller and that Mr. Bray knew where it was and was free to retrieve it at any time.

13. Chris Posey, one of Robert Bray's good friends, testified that he reported to Mr. Bray having seen Rick James leaving the porch of the shop one morning, in approximately the third week of October, at about 7:30 a.m. James had nothing in his hands at the time. Jason Posey, Chris Posey's brother and another good friend of Robert Bray's, also testified that he saw Rick James leave the porch of the shop either at the end of September or sometime in October. Jason Posey reported this incident to Bray a couple weeks later.

reports confirmed what Bray already knew: that James was stealing from him.[14]

Defendants also became concerned at some point because Plaintiffs left their back door propped open all the time in order to allow their two dogs in and out. The dogs ruined the new carpet the Brays had installed in the house. Mr. Bray acknowledged that Plaintiffs asked about a dog when they were discussing renting the house but stated that he told them that the dog was only permissible if it was tied up outside. While Plaintiffs did tie up one dog, they continued to let the other one run free. The dogs dug huge holes in the yard—all the way down to the foundation of the house—that made it impossible to mow the grass. Mrs. Bray, who manages the Brays' rental properties, testified that the Brays do not ever allow pets in their houses.[15] In fact, they have in the past evicted tenants because of pets. Mrs. Bray personally saw, at some point, the smaller of the two dogs in the house.

Upon receiving an invoice for $180.36 in fuel oil that he had neither ordered nor received, Mr. Bray, based on the notation "In House" on the bill, went to ask Cousins and James if they had charged fuel to Bray, even though they had no permission to do so. Cousins and James admitted that they had. They told him they did not have the money to pay him then but could pay the following Wednesday. On the following Wednesday, October 22, 2003, Mrs. Bray went to the house to collect the $180. She accepted a payment of $140 since Plaintiffs did not have the full amount. She also told them about Defendants' concern with Plaintiffs' dogs and told them she wanted to look at the carpet. Mrs. Bray walked from the kitchen to the living room to the family room. She noticed wear on the carpet but no messes.

On Thursday, October 23, Mr. Bray came home from work and asked Mrs. Bray if she had said certain things while she was at Plaintiffs' house the night before. The Brays at this point were already upset because things had been missing. Mrs. Bray went to Yoakem's house to investigate and discovered that it was James who had told Yoakem these things. At this point, Mrs. Bray decided that she was not going to put up with Plaintiffs anymore. She decided that the rent money was not worth it to her, and that she would rather have the house vacant than have to deal with people telling lies about her.[16] At that point, Mrs. Bray filled out the three-day notice form with the basic information.[17] She delivered the notice that evening, October 23. Lisa Bray informed Cousins of the reasons Defendants were seeking to evict Plaintiffs: that they believed Plaintiffs had been stealing from

14. Mr. Bray did concede, on cross-examination, that he keeps a key to the large garage on a ledge. His employees, as well as Ben Mason's employees and all the people who deliver to his business, thus have access to the shop at all times. During most of the day, no one is present at the shop since both sets of employees are usually at a work site.

15. William Barnett, who helps the Brays manage their rental properties and has occasionally shown properties for them, corroborated that the Brays' policy is not to allow animals inside the house. Robert Cable, a former tenant of the Brays', agreed that, at least when he rented from the Brays in 2000,

they did not allow him to have dogs in his trailer.

16. On cross-examination, James acknowledged that his exaggerations regarding Mrs. Bray's conduct on October 22 may have been a contributing factor in the Brays' desire to evict Plaintiffs.

17. Mrs. Bray testified that she did not include the grounds for the eviction on the form because the grounds were too complex to include on the form; she preferred to explain it verbally.

Mr. Bray and that James had lied about the way Mrs. Bray acted when she came to collect the fuel money.[18] Mrs. Bray stated in court that the reasons for the eviction included the dogs in the house, as well as the hurtful things Plaintiffs said that Mrs. Bray said about Cousins' sons. Mr. Bray testified that the basis for the eviction was the theft of various missing items. Mrs. Bray said that she did not consider the race of Cousins' sons in making the eviction decision. She had been aware of Cousins' sons for some time and had occasionally spoken to them in the yard.

On Friday, October 24, the Brays found the remaining $40 owed on the fuel bill, along with James' handwritten note, on Mr. Bray's desk in the large garage. On October 31, Mrs. Bray delivered to Plaintiffs a letter she obtained from the office of an attorney she had used before in such matters. The attorney, Rebecca Cook, was not in when Mrs. Bray called, but since Mrs. Bray had used a very similar letter in the past, Ms. Cook's secretary was able to provide the letter. On November 3, Mrs. Bray delivered to Plaintiffs a 30–day notice to vacate since she had determined that the three-day notice delivered earlier was not valid. On November 10, 2003, Defendants, after notice to Plaintiffs, conducted an inspection of Plaintiffs' house. At this inspection, Defendants discovered that Plaintiffs had stolen an oil barrel from Mr. Bray's shop,[19] that Plain-

tiffs were allowing at least one dog inside,[20] that the dogs had worn the new carpet, and that there was no evidence that the stolen lumber had been used in the house.

When Mr. Bray went to return Cousins and James' November rent, on November 3, he took two friends, Jim Armstrong and Jeremy Mason, with him. The three men were on their way to go hunting, and Bray asked Armstrong and Mason if they would mind making a stop on the way. All three men went up to the door together. All three men testified that Mr. Bray made no racist comments, but that he said something like, "I do not want your money. I want you out of my house."

Mr. Bray contends that he fired Yoakem both because Yoakem frequently took long lunches with his girlfriend when his truck was loaded and needed to get to its destination and because Bray suspected Yoakem and James of stealing his things. Bray noted that his suspicions of Yoakem and James as the thieves were based on the fact that, even though they were both supposedly keeping an eye on the place for him, neither one ever reported any suspicious activities.

Thurman Zimmerman, a long-time friend of Mr. Bray's who has four biracial children, testified as to the good relationship he and his children have always had with Mr. Bray.[21] Robert Cable, a tenant of the Brays' for about four months in 2000

---

**18.** Mrs. Bray testified that she provided the same reasoning to Sharrie Pierce in a subsequent phone conversation.

**19.** There was testimony on both sides about an oil barrel that Mr. Bray allegedly discovered had been stolen from his business when he saw it outside Plaintiffs' house, by one of the doors. Mr. Bray discovered the oil barrel on November 10. Any evidence about the oil barrel is thus irrelevant, since it could not have formed part of the basis for Defendants' decision to terminate Plaintiffs' tenancy.

**20.** Defendants discovered and photographed full dog dishes inside the house.

**21.** Alan Bray, Robert Bray's estranged brother, conversely testified that Robert Bray used to make fun of Zimmerman's biracial children. Alan Bray stated that his brother frequently called them "half-breed children." Robert Bray denied ever having made such comments.

who has a biracial daughter, also testified that he never felt that the Brays discriminated against him or his daughter. Rusty Reynolds, an employee of Robert Bray's, testified that he has biracial nieces and nephews, that the Brays have never treated those children differently from any others, and that he has never heard any disparaging remarks relating to either those children or any other biracial children. Mr. Bray testified that he had never used the word "nigger." Likewise, Mrs. Bray testified that she had never used the word "nigger," that she had previously rented to tenants with biracial children, and that she never said anything derogatory about Cousins' sons.

Defendants contend that they engaged in no harassing or intimidating activities.[22] They assert that the noise level remained the same as always. Jeremy Mason, an employee of Bray's, testified that there was no difference in the amount of noise before and after the middle of October. Jeremy Mason stated that all the drivers use their jake brakes when coming into the driveway to Mr. Bray's business, especially when the trucks are loaded. Charles Rayburn, another employee of Mr. Bray's, testified that there was no increase in noise and that the jake brakes of Mr. Bray's trucks come on automatically when the driver releases the gas pedal. Rusty Reynolds corroborated the absence of any unusual noise and the fact that the jake brakes on Mr. Bray's trucks are set to operate automatically when the driver releases the gas pedal. Mr. Bray testified, and other witnesses agreed, that he seldom drives a large truck with a jake brake. The Brays assert that if the preliminary injunction is issued, they will be forced to hire a security guard to watch the premises to prevent any additional theft.

## III. STANDARD OF REVIEW

In determining whether to issue a preliminary injunction, the court must consider (1) whether the movant has established a substantial likelihood of success on the merits; (2) the irreparable harm that could result to the movant if the injunction is not issued; (3) the possibility of substantial harm to others if the injunction is issued; and (4) whether the public interest would be served by issuing the injunction. *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 230 (6th Cir.2003) (quoting *Nightclubs, Inc. v. City of Paducah*, 202 F.3d 884, 888 (6th Cir.2000)). The elements are factors to be balanced against each other; each element need not be satisfied to issue a preliminary injunction. *Dayton Area Visually Impaired Persons, Inc. v. Fisher*, 70 F.3d 1474, 1480 (6th Cir.1995) (quoting *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir.1985)). The movant has the burden of proving that the circumstances clearly demand a preliminary injunction. *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir.2000) (citations omitted).

## IV. ANALYSIS

### A. Likelihood of Success on the Merits

The 1968 Fair Housing Act makes it unlawful to refuse to rent or

---

**22.** Mr. Bray testified that when Plaintiffs first moved in, James asked him for permission to store his motorcycle in the medium-sized garage for a couple days until he could get some boxes cleared out of the small garage. Mr. Bray agreed, but told James he would need to move the motorcycle after a few days because Mr. Bray needed the space. When the motorcycle was not moved, Mr. Bray asked James to move it. James still did not move the motorcycle. When Bray bought a new straw-blower, he needed the space so he put the motorcycle outside. Mr. Bray testified that he did not previously keep the medium-sized garage locked, but that he began to lock it after the theft of the lumber.

otherwise deny housing to any person on account of race. 42 U.S.C. § 3604(a). In order to succeed on their Fair Housing Act claim, Plaintiffs need not show that race was the sole factor in Defendants' decision to terminate the tenancy; they need only establish that race was one motivating factor in the decision. *See Green v. Century 21*, 740 F.2d 460, 464 (6th Cir.1984); *United States v. Mitchell*, 580 F.2d 789, 791 (5th Cir.1978); *Moore v. Townsend*, 525 F.2d 482, 485 (7th Cir.1975).

If the testimony of Plaintiffs' witnesses is believed, then Plaintiffs have a very strong likelihood of success on the merits of their case. Plaintiffs presented credible evidence that both Mr. and Mrs. Bray were motivated by race, at least in part, in making their decision to terminate the tenancy. Plaintiffs have direct evidence of discrimination in the form of comments allegedly made by Defendants that indicate the termination of the tenancy was closely tied to racial considerations. Defendants' alternative grounds for the decision appear to be post hoc rationalizations and do not eliminate the possibility that racism was also a factor. While the testimony of the Defendants' witnesses, if believed, is sufficient to allow a jury to find in favor of Defendants, the Court generally finds the Plaintiffs, and their witnesses, to have been more credible than the Defendants and their witnesses.

The evidence adduced at the hearing on this matter covered a broad range of topics; however, the central issue in determining whether Plaintiffs are likely to succeed on the merits is quite narrow. The issue is whether Mr. and Mrs. Bray's decision to terminate the tenancy, made on or about October 23, 2003, was actually motivated, at least in part, by the race of Cousins' sons. For example, a substantial amount of testimony was elicited and exhibits were introduced regarding Defen-

dants' November 10 inspection of Plaintiffs' house. The fact that Defendants' suspicions of Plaintiffs may have been corroborated by the inspection, however, is immaterial to whether, at the time the eviction decision was made, the decision was based on those suspicions or on impermissible racial factors. Evidence based on the November 10 inspection is relevant only in determining the balance of harms should an injunction issue. Similarly, this Court is not overly concerned with whether Plaintiffs actually stole anything from Defendants. Any evidence of Plaintiffs' alleged theft is relevant only insofar as it sheds light on what Defendants knew at the time of the notices and what motivated them at that time. Ex post facto evidence as to any theft by Plaintiffs or as to the conditions of the house is immaterial.

Supporting Plaintiffs' theory that the termination decision was motivated by race is, in essence, the following evidence: that Cousins' sons did not move in with Plaintiffs until September, raising the possibility that Defendants did not become aware of the sons, and their race, until sometime in October; that Lisa Bray, in her conversation with Sharrie Pierce shortly after the termination decision, made both derogatory comments about Cousins' sons and comments indicating that she had not earlier been aware of their race; that Robert Bray explicitly stated, upon returning Plaintiffs' November rent money, that he wanted the "niggers" out of his house; and that Robert Bray fired Kenny Yoakem based on his connection with and his refusal to tolerate derogatory comments about Cousins' sons.

Defendants offered testimony to counteract all of the above evidence. At least some of that testimony, however, was not especially credible. Notably, Mr. Bray's alternate explanation for firing Yoakem was flimsy. Yoakem provided a credible

description of the interchange that led to the termination of his employment with Bray. The reasoning provided by Mr. Bray, on the other hand, was that Yoakem had reportedly been having long lunches with his girlfriend while on the job and that Bray suspected Yoakem and James of stealing his things together. There was no testimony that Bray ever warned Yoakem not to take long lunches, and the long lunches, on their own, seem an insubstantial reason for Bray to have fired Yoakem. The only reason that Bray provided for his suspicion that Yoakem and James, together, were stealing from him, was that, because of the location of Yoakem's girlfriend's house and James' house, the two men should have heard and reported the real thieves. Since they never reported any suspicious occurrences to Bray, they must themselves have been the thieves. This "evidence" is not compelling and would likely not have been sufficient to cause a reasonable person to fire an employee. Furthermore, Bray did not provide any alternative description of the exact circumstances surrounding Yoakem's termination. Also, though Defendants presented corroborating testimony on almost every other point, major and minor, on which corroboration was possible, there was a notable absence of any corroboration for Bray's claim that the conversation described by Yoakem did not occur. Once the Court accepts that Yoakem was fired because of his refusal to tolerate Bray's racial jibes about Cousins' sons, the other evidence presented by Plaintiffs tends to appear more credible, while Robert Bray's other testimony becomes less believable.

Defendants' first alternative explanation for their desire to have Plaintiffs move out is that Plaintiffs were stealing from them. Defendants, however, had a marked lack of evidence before them that Plaintiffs were, in fact, the culprits. A large amount of fuel and a number of tools were indisputably stolen from the vicinity of Mr. Bray's shop. In support of his belief that Plaintiffs were responsible for the thefts, Mr. Bray offers only that the thefts did not begin until sometime after Plaintiffs moved in[23] and that he received a few reports of James being seen near the shop. No one ever saw James actually taking anything, and no evidence of the missing property was found in or near James' house. While Robert Bray claims that James would have had no reason to be near the shop, the shop is very close to James' home and Bray admits that he had asked James to keep an eye on the shop. The shop was left unattended for the vast majority of any given day, and well over a dozen people were aware of the location in which Bray left a key to the shop. Any number of people could have stolen the tools and the fuel, and Bray had little apparent reason to focus his suspicion on James.

Bray seems to point to the lumber, the motor puller, and the fuel oil in the house tank as evidence that James could not be trusted and would steal from him if given an opportunity to do so. Plaintiffs, however, offered credible explanations for all three items. Furthermore, the lumber, the motor puller, and the fuel oil for the house tank were all taken in an aboveboard fashion; there was no stealth involved, and Plaintiffs freely admitted that they had taken these things and that, in fact, they believed they had permission to do so. When asked who had used the

---

**23.** It should be noted that Kenny Yoakem disputes this point, claiming that Mr. Bray had had problems with theft even before Plaintiffs moved into the house on Upper Twin Road. Given the loose security at Bray's shop, the Court finds it easy to believe that Mr. Bray was often a victim of theft.

lumber, James admitted that he had done so; there was no attempt at misdirection as there might have been had James believed that he was stealing. The fact that James openly borrowed a motor puller and refused to return it likewise is not probative of whether James was secretly stealing from Bray. Stopping a fuel truck driver in broad daylight and asking for a diversion of fuel similarly seems to be a poor strategy for anyone intent on theft. In short, because the Brays had no rational basis for believing that Plaintiffs were stealing from them they either did not, in fact, so believe, or they had such a belief, but that belief was based on irrational factors such as the race of Cousins' sons. Since James admitted that the Brays suspected him of stealing, the Court is forced to conclude that Defendants' suspicions of Plaintiffs likely were impermissibly tainted by racial considerations.

The Brays also contend that the decision to terminate the tenancy was based in part on the condition of the house, namely wear in the carpet and holes in the yard caused by two dogs, despite the Brays' policy that dogs not be allowed in the house and be tied up when outside. Though Mrs. Bray testified that she had previously evicted tenants on the basis of their pets, not even Defendants assert that the condition of the house and the existence of the dogs were the only reasons behind the termination decision. Even accepting as true every contention that Defendants make about the house and the dogs, this justification thus does not preclude the possibility that race also played a role in the ultimate decision to end the tenancy.

The final alternative justification offered by Defendants is that the decision to terminate Plaintiffs' tenancy was based on the lies James told about Lisa Bray. Given the temporal relationship between James' admitted embellishments and exaggerations regarding Mrs. Bray's behavior and the delivery of the first notice to vacate, this justification is the most persuasive one that Defendants provide. The Court believes that James' falsehoods regarding the events of October 22 were probably a factor in the decision to terminate the tenancy, at least in Mrs. Bray's mind. James himself admits that the story he told may have been a factor in the ultimate decision. Assuming, however, that the decision to attempt to evict Plaintiffs was, at least to some extent, a joint decision made by Mr. and Mrs. Bray, Defendants encounter a problem. Mr. Bray did not testify that the lies told by James about Mrs. Bray played any part in the decision. When asked why Defendants sought to evict Plaintiffs, Mr. Bray clearly responded that it was because Plaintiffs had been stealing from them. As noted above, the Court believes that any belief that Defendants had that Plaintiffs were responsible for the thefts was probably impermissibly tainted by racism. Even Mrs. Bray noted that the lies were not the sole reason for providing Plaintiffs with a notice to vacate, but that the suspicions of theft also played a role.

The only justification provided to Plaintiffs in writing was nonpayment of rent. Clearly, nonpayment of rent was not the real reason that Defendants sought to evict Plaintiffs. Plaintiffs had paid the rent through October and tendered the rent payment for November. The inconsistency between the one reason provided in writing to Plaintiffs and the ex post facto reasons offered at the hearing on this matter both further undermine the Brays' credibility and strengthens the inference that the true reason for the eviction was an impermissible one. On the whole, judging the credibility of witnesses and the implausibility of the alternative grounds offered by Defendants as forming the basis for the decision, the Court finds that Plaintiffs are likely to succeed on the merits.

While a jury could find otherwise, this Court is not required to determine the certain outcome, but merely the likely outcome. Plaintiffs have met the first prong of the test for issuance of a preliminary injunction.

## B. Irreparable Harm

■ Because the Fair Housing Act provides that equitable relief is available where there is a violation of the statute, 42 U.S.C. § 3613(c)(1), the traditional showing of irreparable harm is not required in order to grant a preliminary injunction in a Fair Housing Act case. *Epicenter of Steubenville, Inc. v. City of Steubenville*, 924 F.Supp. 845, 852 (S.D.Ohio 1996) (quoting *Baxter v. City of Belleville, Ill.*, 720 F.Supp. 720, 731 (S.D.Ill.1989)). As noted by this Court in its November 21, 2003, Order granting Plaintiffs' Motion for a Temporary Restraining Order, because of the strong national policy against race discrimination in housing, once a plaintiff has demonstrated a likelihood of success on the merits of a claim of housing discrimination, irreparable harm will be presumed. *See Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1423 (11th Cir. 1984); *Stout v. Evergreen Terrace Props.*, Civil Action No. C–2–93–0362, Order of April 9, 1993, at 5 (S.D.Ohio 1993).

Though they are entitled to the benefit of the legal presumption of irreparable harm, Plaintiffs here have nonetheless made some showing of actual irreparable harm. The eviction from their home of a financially insecure family in the middle of winter could well constitute irreparable harm. Plaintiffs have thus satisfied the second factor of the test for a preliminary injunction.

## C. Substantial Harm to Others

Defendants seem to contend that they would suffer substantial harm if this Court issued a preliminary injunction because Plaintiffs would continue to steal from Mr. Bray and ruin the house. As noted above, there is little, if any, real evidence that Plaintiffs are stealing from Mr. Bray's business. Defendants' belief that Plaintiffs are stealing from the business is little more than mere speculation. Defendants seem to assert that the harm to them was amply demonstrated by the November 10 inspection of the house. At best, however, the November 10 inspection revealed that Plaintiffs had stolen an oil barrel,[24] that Plaintiffs were allowing dogs in the house, that the new carpet was worn as a result of the dogs, and that Plaintiffs had not used the stolen lumber in the house.[25] Very recently, the Brays also noticed that the window on the door that Plaintiffs leave propped open for their dogs was missing.

Such harm as that alleged by Defendants here is not substantial and cannot compare with the harm that would be suffered by Plaintiffs if this Court were to refuse to grant the injunction. Plaintiffs are paying rent, so Defendants cannot claim any harm suffered as a result of an arrearage. As alluded to above, the harm to Plaintiffs from being evicted, especially at this time of year, would be substantial. Cousins testified that Plaintiffs do not have the financial resources to move and would likely encounter serious obstacles in finding a new place to live. Plaintiffs also offered credible evidence of harassment and intimidation they have suffered at the

---

24. Not only was this oil barrel being stored in plain sight outside Plaintiffs' house, but James testified that he took the oil barrel only after Yoakem indicated that Mr. Bray had given permission to do so.

25. Plaintiffs countered this evidence with photographs purportedly showing shelves in the house that had been built with the missing lumber.

hands of Mr. Bray. Because the likely harm to Plaintiffs if the Motion is denied substantially outweighs any speculative harm that Defendants might suffer if the Motion for a Preliminary Injunction is granted, this factor weighs in favor of granting a preliminary injunction.

### D. Public Interest

As noted above, there is a strong public interest in preventing race discrimination in housing. *See Brown v. Artery Org., Inc.*, 654 F.Supp. 1106, 1119 (D.D.C. 1987) ("[T]he public interest will most readily be served if prevention of the spread of racial discrimination in housing is given priority weight."). The public has a substantial interest in ensuring both that the Fair Housing Act is not violated and that, if violations occur, such violations are vindicated. Because Plaintiffs have established a likelihood of success on the merits, the public interest favors the granting of the preliminary injunction.

### V. CONCLUSION

All four factors favor the issuance of a preliminary injunction. Based on this analysis, the Court hereby **GRANTS** Plaintiff's Motion for a Preliminary Injunction. It is hereby **ORDERED** that Defendants be preliminarily enjoined from:

(1) proceeding with any attempt to evict Plaintiffs, Donna Cousins and Rick James; and

(2) Harassing, intimidating, or threatening, both in the ways stated in the Complaint and at the hearing on this Motion and in any other way, Donna Cousins, Donna Cousins' sons LeeMan Brown and James Harding, or Rick James.

It is further **ORDERED** that Defendants shall comply with all provisions of Ohio landlord/tenant law. In particular, in accordance with section 5321.04 of the Ohio Revised Code, Defendants must give Plaintiffs 24 hours' notice of any intent to enter the premises.

**IT IS SO ORDERED.**