[Cite as *Pittman v. Parillo*, 2017-Ohio-1477.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

Raymond H. Pittman, III, et al.                    Court of Appeals No. L-16-1140

        Appellants                                Trial Court No. CI0201402890

v.

Nick Parillo, et al.                                **DECISION AND JUDGMENT**

        Appellees                                 Decided:  April 21, 2017

* * * * *

Raymond H. Pittman, III, John A. Smalley and Benjamin Felton,
for appellants.

Gregory H. Wagoner and Rebecca E. Shope, for appellees Nick Parillo,
Mike Mankowski, Sylvania Tam-O'Shanter Sports, Inc. and Sylvania
Area Joint Recreation District.

Jason M. Van Dam and Daniel T. Ellis, for appellee Anthony P. Spinazze.

* * * * *

**OSOWIK, J.**

{¶ 1} This is an appeal from a May 31, 2016 summary judgment ruling of the

Lucas County Court of Common Pleas, granting summary judgment to appellees.  For the

reasons set forth below, this court affirms the judgment of the trial court.

**{¶ 2}** Appellants, Raymond and Ann Pittman, set forth the five (5) following assignments of error:

1. THE TRIAL COURT ERRED IN AWARDING SUMMARY JUDGMENT TO APPELLEES, PARILLO, TAM-O-SHANTER, AND SYLVANIA AREA JOINT RECREATION DISTRICT ("SAJRD") ON APPELLANT, ANN PITTMAN'S CLAIM UNDER R.C. 4112.02(G).

2. THE TRIAL COURT ERRED IN AWARDING SUMMARY JUDGMENT TO APPELLEES, PARILLO, MANKOWSKI, TAM-O-SHANTER, AND SAJRD ON APPELLANTS' CLAIMS FOR RETALIATION UNDER R.C. 4112.02(I).

3. THE TRIAL COURT ERRED IN AWARDING SUMMARY JUDGMENT TO APPELLEES ON APPELLANT ANN PITTMAN'S R.C. 4112.02(J) CLAIM.

4. THE TRIAL COURT ERRED IN AWARDING SUMMARY JUDGMENT TO APPELLEES, PARILLO, MANKOWSKI, TAM-O-SHANTER, AND SAJRD ON APPELLANTS' DECLARATORY JUDGMENT ACTION.

5. THE TRIAL COURT ERRED IN AWARDING SUMMARY JUDGMENT TO APPELLEE, SPINAZZE ON APPELLANTS' NEGLIGENCE CLAIMS AGAINST HIM.

2.

**{¶ 3}** The following undisputed facts are relevant to this appeal. This case stems from the participation of appellants' minor son in youth hockey leagues and related events at the Tam-O-Shanter athletic facility located in Sylvania, Ohio.

**{¶ 4}** The genesis of this matter lies in appellants' subjective perception that their ten-year-old son did not receive an adequate amount of playing time in a youth hockey scrimmage game. That perception on a seemingly innocuous subject inexplicably unleashed a series of events rooted in animus and retribution directed by appellants against appellees.

**{¶ 5}** On May 4, 2014, shortly after the subject scrimmage game, Ann Pittman sent an email to her son's coach obtusely alleging without any discernible basis, "Today I felt like he was being held out of the scrimmage by you. *It seemed he was being purposely held out of the rotation.*" (Emphasis added). This initial email conceded the possibility that it could be, "[S]imply a mother's misinterpretation."

**{¶ 6}** The following day, on May 5, 2014, Raymond Pittman sent a follow-up email to the coach conveying, "I felt so bad for my boy because he really wanted to play and do well because he knew his mom was going to be there. It was difficult as a dad to watch him so eager to get on the ice and then be sent to the back of the line ever[y] time it was his turn in the third period." Apparently, appellants suffered from the fervent belief that during the third period portion of the scrimmage game, their son received inadequate playing time in comparison to the other team members.

**{¶ 7}** On May 6, 2014, the coach replied in a professional, polite, and detailed email. It conveyed in pertinent part, "With the team being a travel team we try to find a balance between developing all players and winning the game. We cannot guarantee equal playing time. We do however try to make it as equal as possible. There will be times however when we are unable to keep the ice time equal." Appellants' course of action following the reasoned reply by the coach is when the matter quickly escalated and spiraled out of control.

**{¶ 8}** Interestingly, on May 6, 2014, shortly after receipt of the email response from the coach, Ann Pittman sent another email to a different official at Tam-O-Shanter unilaterally claiming to having been previously subjected during the prior summer to improper "attention" from a male member of the youth hockey coaching staff.

**{¶ 9}** In coordination with this, on May 6, 2014, Raymond Pittman sent another email perniciously proclaiming without any evidence whatsoever that the subject hockey coaching staff member, "[S]aw somebody he wanted to score with [Ann Pittman] and that's all he saw * * * Did you describe her as the pretty redhead that she is and that I told you to refer to her as? I doubt it * * * Frankly, I think I'm just going to go ahead and either file a lawsuit or a formal harassment complaint." Notably, this belligerent email was sent just one day after Raymond Pittman's initial email questioning the amount of third period playing time allotted to his son in the May 4, 2014 scrimmage.

**{¶ 10}** Appellants' reflexively adversarial course of conduct quickly escalated. On May 14, 2014, Raymond Pittman left a petulant, plainly threatening voicemail for

4.

another Sylvania official cautioning, "[T]hat's just the beginning.  It's gonna be a long complaint * * * [T]his is gonna get blown wayyy outta proportion in about 24 hours, if not today, if I can finish it, *so you better call me back, uh Tony so, unless you really really want a bad bad situation*."  (Emphasis added).

{¶ 11} The record also reflects that Raymond Pittman repeatedly emphasized his professional position as an attorney and repeatedly attempted to intimidate appellees with a promised array of legal consequences if they failed to concur and capitulate on the various baseless claims.  For example, in the May 6, 2014 email filed at the onset of this matter, Raymond Pittman portended, "*When* the lawsuit or harassment charge is filed, it will be interesting to talk to witnesses and obtain Nick's personal file to see if there have been other similar complaints.  I bet there have been."  (Emphasis added).  The record reflects that despite several years of exhaustive discovery, no evidence collaborating appellants' claims was discovered.  However, on the contrary, the record reflects that the discovery process did reveal appellants' pattern of tactically issuing unsubstantiated claims to advance a personal agenda.

{¶ 12} Approximately a month after the subject scrimmage game, on June 19, 2014, appellants filed a complaint setting forth a litany of perfunctory, unsupported allegations purporting to demonstrate sexual harassment by various Sylvania hockey personnel and athletic officials directed at Ann Pittman.

5.

{¶ 13} The record reflects that the sum total of appellants' purported evidence was comprised of unilateral allegations of "flirting," "leering," "smiling," "staring," "attempts to make eye contact," and so on.

{¶ 14} The record reflects that as a result of the illusory claims of appellants, 35 depositions were taken and considerable, costly discovery was necessitated in a case entirely devoid of any actual evidence of any unlawful conduct.

{¶ 15} The record shows that Ann Pittman has issued similar dubious claims against others. The record shows that the veracity of any of the claims by Ann Pittman has never been established.

{¶ 16} Given a record devoid of actual evidence, during Ann Pittman's deposition, she was asked to articulate the basis of why she believed that one of the appellees had been somehow improperly "flirting" with her. She vacuously replied, "[L]ike he kept like smiling-- like he just was-- it was very animated, very smiley, like I saw his teeth like a million times." Suffice it to say, even assuming arguendo the legitimacy of the characterization, no unlawful act was described.

{¶ 17} Notably, in a case rooted entirely upon unsupported claims of improper "looks" or "leers" of an alleged sexual nature directed against Ann Pittman by male staff or coaches affiliated with Tam-O-Shanter, one of Raymond Pittman's first emails to Tam-O-Shanter regarding the alleged matter ironically demanded, "Did you describe her as the pretty redhead that she is and that I told you to refer to her as?" Raymond Pittman

6.

demanding that his wife be characterized in such a way to the alleged wrongdoers in the context of a case such as this is paradoxical.

{¶ 18} The record is devoid of evidence of any improper remarks being made to Ann Pittman. The record is devoid of evidence of any improper physical touching being made to Ann Pittman. The record is devoid of evidence of any improper communications; verbal, email, text, voicemail, or any other method or mode of communication, being directed to Ann Pittman.

{¶ 19} On the contrary, the record consists solely of ambiguous, unilateral, unsupported, and conclusory claims of alleged improper "flirting," "leering," "smiling," "staring," and alleged illicit efforts to "make eye contact." None of the claims were in any way collaborated or substantiated.

{¶ 20} Ultimately, on May 31, 2016, the trial court granted summary judgment to all of the appellees on each and every count pending before the trial court. The record reflects that the trial court summary judgment ruling was exceptionally detailed, precise, and exhaustive. This appeal ensued.

{¶ 21} All of the assignments of error stem from the premise that the trial court erred in granting summary judgment to appellees. As such, they will be addressed simultaneously.

{¶ 22} It is well-settled that an appellate court reviews the trial court's granting of summary judgment on a de novo basis, applying the same standard used by the trial court. *Lorain Nat'l Bank v. Saratoga Apts.*, 61 Ohio App.3d 127, 572 N.E.2d 198 (9th

7.

Dist.1989). Summary judgment will be granted when there remains no genuine issue of material fact and, when construing the evidence most strongly in favor of the non-moving party, reasonable minds can only conclude that the moving party is entitled to judgment as a matter of law. Civ.R. 56(C).

{¶ 23} We have reviewed and considered this matter. We find that the record is devoid of any evidence whatsoever in support of appellants' claims. Conversely, the record reflects ample evidence of trivial animus and suspect motives on the part of appellants.

{¶ 24} The record reflects that the trial court summary judgment ruling was uniquely thorough, well-reasoned, and all-encompassing in properly granting summary judgment to all appellees on all claims. We concur that reasonable minds may only conclude that appellees are entitled to judgment as a matter of law. Wherefore, we hereby adopt the trial court summary judgment ruling in its entirety, attached hereto as Appendix A, and restate it as if fully rewritten herein.

{¶ 25} Wherefore, we find appellants' assignments of error not well-taken. The judgment of the Lucas County Court of Common Pleas is hereby affirmed. Appellants are ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.
_____
JUDGE

James D. Jensen, P.J.
_____
Christine E. Mayle, J.
JUDGE
CONCUR.

_____
JUDGE

APPENDIX A


May 31, 2016 Trial Court Entry
Journalized June 2, 2016


IN THE COURT OF COMMON PLEAS OF LUCAS COUNTY, OHIO

|  |  |  |
|---|---|---|
| | * | |
| Raymond H. Pittman, III, et al., | | |
| | * | |
| Plaintiffs, | | Consolidated Case No. CI0201402890 |
| | * | |
| vs. | | OPINION AND JUDGMENT ENTRY |
| | * | |
| Nick Parillo, et al., | | Hon. Myron C. Duhart |
| | * | |
| Defendants. | | |
| | * | |

This case is before the Court on three separate motions for summary judgment:

1.) one filed by defendants Nick Parillo, Mike Mankowski, Tam-O-Shanter, Inc. and Sylvania

Recreational District (the "Parillo defendants"); 2.) one filed defendants Anthony Spinazze

("Spinazze") and his law firm, Lydy & Moan, Ltd. (the "Spinazze defendants"); and one filed by

William and Julie Malone.  Upon review of the pleadings, evidence, arguments of the parties, and applicable law, the Court will grant all three motions.

## I.  <u>INTRODUCTION</u>

Almost two years ago a respected local attorney and his wife, two loving parents, filed the instant sexual-harassment/sexual-discrimination case against a community-owned, family-oriented hockey facility located in Sylvania, Lucas County, Ohio.  The parents are the plaintiffs, Ray and Ann Pittman ("Ray" and "Ann," respectively).  At that time, the Pittmans lived in Sylvania, Lucas County, Ohio, where they worshipped and schooled their two children at St. Joseph's Parish and St. Joseph's School, respectively (together "St. Joe's").  Their eldest, a then-ten year old son, Max, enjoyed practicing and playing hockey at the facility.

The hockey facility, original-defendant Tam-O-Shanter, Inc. ("Tam-O-Shanter"), is owned by another original-defendant, the Sylvania Recreation District ("SRD").  Tam-O-Shanter is a public, nonprofit Ohio corporation, organized to provided an ice-rink and ice-hockey facility; it is governed by SRD.  Tam-O-Shanter endeavors to provide a safe and wholesome environment for families with children who are interested in learning about and playing competitive hockey in Lucas County.  The remaining original defendants are Nick Parillo ("Parillo") and Mike Mankowski ("Mankowski") who are employees of Tam-O-Shanter.  Parillo is a coach and is the coordinator of travel-hockey teams; Mankowski is a coach and is the facility manager/supervisor at Tam-O-Shanter.  (Complaint paras.2-4.)

The Pittmans later joined the Spinazze defendants with the filing of the third amended complaint. Spinazze has been legal counsel for Tam-O-Shanter, its employees, and SRD prior to June 19, 2014 when the Pittmans filed their original complaint in this case.

The Pittmans joined a last pair of defendants, husband and wife William "Mick" Malone and Julie Malone ("Julie").[1] The Malones are acquainted with the Pittmans through their respective families' involvement at Tam-O-Shanter as well as at St. Joe's. Mick has been a volunteer coach for his child's team at Tam-O-Shanter. Ray also has served as a volunteer coach there.

Non-party Stephen Chang ("Coach Chan") is a former coach at Tam-O-Shanter who, at all times relevant, has been the director of hockey and a coach at Findlay Amateur Hockey Association ("FAHA") located in Findlay, Hancock County, Ohio. Mick had been a volunteer coach serving under Coach Chan while Chan was at Tam-O-Shanter.

Other relevant non-parties are: Sue and Dave Desjardins, Toby and Tracy McCanna, Tracy and Troy Roscoe, Ted and Monica Leslie, Pam Sanford, Amy Mallek. (*See* Oppo.to Malone Brief pp.6-20.) These other non-parties (together, the "friends.") are in friendship-relationships with the Malones (and to some extent, each other) through St. Joe's and/or Tam-O-Shanter; they maintain at least irregular electronic-contact. (*See* Tracy Roscoe Depo.pp.9-14; J.Malone Depo.pp.18-19,35-39,49,54-55,65,72-73.)

---

[1] The Pittmans filed a separate action against the Malones in this Court, on October 19, 2015: case number CI0201504434. The Court has consolidated that separate case into the instant case.

12.

The Pittmans filed their original complaint on June 19, 2014. Attached to that original complaint was an eight page document entitled "Ann Pittman's Statement" ("Ann's Statement"). Ann's Statement contains Ann's description of alleged incidents of sexual harassment perpetrated on her by defendant Parillo.

The Pittmans filed an amended complaint as a matter of right on July 14, 2014; the amended complaint also contained Ann's statement. On August 25, 2014, the Pittmans sought leave to file a second amended complaint. Soon after, on August 28, 2014, the Parillo defendants filed a Civ.R. 12(B)(6) motion to dismiss ("first motion to dismiss") which addressed the amended complaint (not the second amended complaint).

On September 25, 2014 ("September 2014 Entry") the court granted the Pittman's motion for leave to file a second amended complaint which the Pittmans filed that same day. The Court's entry reads in pertinent part as follows: "In an abundance of caution, and finding that a second amended complaint will clarify the issues for resolution, the Court hereby ORDERS that the plaintiffs' motion for leave to file their second amended complaint is granted." (September 2014 Entry.) Also in that entry, the Court denied the Parillo defendants' first motion to dismiss. Without explanation, the Pittmans chose to eliminate Ann's Statement from the second amended complaint.

The Parillo defendants filed another motion to dismiss ("second motion to dismiss") directed at the Pittmans' second amended complaint on October 24, 2014. On January 28, 2015, the Court issued an Opinion and Judgment Entry ("January 2015 Entry") in

which the Court granted in part and denied in part the Parillo defendants' second motion to dismiss.[2]

The parties have engaged in extensive discovery. They often have sought the Court's help to resolve discovery disputes. The Parillo defendants, the Spinazze defendants, and the Malones have filed their separate motions for summary judgment with large caches of exhibits. The Pittmans have filed opposition briefs to each, also with volumes of exhibits; each set of defendants have filed reply briefs. The Pittmans have filed sur-reply briefs, and defendants have moved to strike these. The Court will merely note that all parties have exceeded, at least once, the local rule which sets forth the twenty-page-limit for briefs, and the Pittmans have filed sur-replies without leave.

## II. FACTUAL BACKGROUND

For the sole purpose of ruling on the instant motions for summary judgment, the Court has construed the evidence in the Pittmans' favor. The Court already has set forth the initial factual background in the January 2015 Entry. The Court will refrain from doing so here, but the Court will refer to other relevant facts in the discussion section below.

## III. MOTION FOR SUMMARY JUDGMENT STANDARD

To succeed on a Civ.R. 56(C) motion for summary judgment, the movant must demonstrate:

---

[2] Had the Pittmans included Ann's Statement in the second amended complaint, the Parillo's second motion to dismiss might have ended this case.

(1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor. *Harless v. Willis Day Warehousing Co.*, 54 Ohio St.2d 64, 66, 375 N.E.2d 46 (1978).

*See also Zivich v. Mentor Soccer Club, Inc.*, 82 Ohio St.3d 367, 369-370, 1998-Ohio-389, 696 N.E.2d 201. "The party moving for summary judgment bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law." *Zivich* at 370, citing *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293, 1996-Ohio-107, 662 N.E.2d 264. *Accord Vahila v. Hall*, 77 Ohio St.3d 421, 429-430, 1997-Ohio-259, 674 N.E.2d 1164; Mitseff v. Wheeler, 38 Ohio St.3d 112, 114-115, 526 N.E.2d 798 (1988). In response, the nonmoving party may not rest on the allegations of her pleading, instead she must establish a genuine issue of material fact by affidavit or in some other manner provided in Civ.R. 56. *State ex rel. Burnes v. Athens Cty. Clerk of Courts*, 83 Ohio St.3d 523, 524, 1998-Ohio-3, 700 N.E.2d 1260.

## IV.  <u>DISCUSSION</u>

In the complaint (as now consolidated), the Pittmans set forth eleven counts:

1.) In Count One, Ann makes a claim against the Parillo and Spinazze defendants for violations of R.C. 4112.02(G).

2.) In Count Two, both Pittmans make claims for retaliation against the Parillo, Spinazze, and Malone defendants under R.C. 4112.02(I).

3.) In Count Three, Ann makes claims against the Parillo and Spinazze defendants under R.C. 4112.02(J) for "aiding and abetting" Parillo's harassment of Ann.

4.) In Count Four, both Pittmans make claims of civil conspiracy against the Parillo and Spinazze defendants.

5.) In Count Five, both Pittmans make a claim of negligence against Tam-O-Shanter.

6.) In Count Six, both Pittmans make negligence claims against Parillo and Mankowski.

7.) In Count Seven, an inactive claim, Ann preserves her 42 USC 1983 claim which the Court dismissed in the January 2015 Entry.  The Court will decline the Pittmans' invitation to reconsider that dismissal.

8.) In Count Eight, the Pittmans make claims for preliminary and permanent injunctions against the Parillo defendants.

9.) In Count Nine, the Pittmans seek an R.C. 2721.03 declaratory judgment as to their rights to full enjoyment of the Tam-O-Shanter facility under the aegis of R.C. 4112.02(G).

10.) In Count Ten, another inactive claim, the Pittmans preserve their defamation claim against Mr. Parillo which the Court dismissed in the January 2015 Entry.  The Court will decline the Pittmans' invitation to reconsider that dismissal.

11.) In Count Eleven, the Pittmans make negligence claims against the Spinazze defendants and SDR.

The Court will address the law and arguments relating to these claims as they relate to each group of defendants in their turn.

### A. COUNT ONE -- R.C. 4112.02(G) PUBLIC-ACCOMMODATION STATUTE
In Count One, Ann Pittman makes a claim against the Parillo and Spinazze defendants for a violation of R.C. 4112.02(G).  All of the wrongful acts of sexual harassment about which Ann complains were done allegedly by Parillo.

### 1. Alleged Incidents of Sexual Harassment
The plaintiffs have identified thirteen incidents in which they allege defendant Parillo engaged in sexual harassment of Ann.  Ann has described these both in Ann's Statement and in her depositions and affidavit testimony.

1.) **On July 17, 2013**, Mr. Parillo interrupted a lesson he was giving in one of the ice rinks at Tam-O-Shanter "and came over to talk to me [Ann,]" who was waiting along side the rink for her son to complete his own practice.  (Ann 4.15.15 Depo.p. ["Depo.__"]17.)  On that

16.

occasion, Parillo skated up to Ann and asked "how is he [Max] doing?"; Ann responded "he's doing good." (Depo.pp.17-18.) Nothing that Parillo *said* to her was "inappropriate," but Ann believed Parillo "was flirting" with her. (Depo.p.18.)

> **Ann:** "He kept -- like he kept like smiling -- like he just was -- it was very animated, very smiley, like I saw his teeth like a million times. I mean, it just -- *he was flirting*. * * *. My interpretation was he was flirting."
> * * *
> **Ann**: "He * * * was just like over animated, smiling just opened his mouth and smiling a lot, like -- I just remember his teeth a lot and his eyes crinkling, and he was just --- *he was flirting*. That's it. That's -- that's all. There's nothing else."
> * * *
> **Ann:** "* * * I felt like *he was flirting*. That's how -- that's my interpretation of what he was -- *he was flirting*." (Depo.pp.18-19.)

    2.) **On July 24, 2013**, Ann was in the lobby at Tam-O-Shanter preparing to take Max home after a lesson; Parillo was in the lobby talking inaudibly with another hockey parent; Parillo began to say that his own "wife" told him (Parillo) about bad traffic; he spoke in an excessively loud voice -- Ann believed that Parillo wanted her to hear the word "wife"; Parillo then waited in the lobby for ten minutes until Ann and her kids began to leave. (Depo.pp.25-28.) Ann believed that Parillo "thought he could just convince Ann, a married hockey mom with small children to engage in [an] affair with him[; h]is sexual agenda was clear to Ann at this point." (Oppo. to Parillo Brief p.6, citing Ann's Affid.paras.2-3.)

> **Ann**: "[Max then said] why did that guy [Parillo], you know, tell me [']good job.['] He [Max] thought it was weird. And I was like -- I said, [']Coach Mark[']? And he's like [']no the other one.['] And I said, [']well, I don't know, I guess he thought you did a good job.['] So I thought that was weird.

17.

"And then we started walking out, and I was with Georgia [daughter] and Max, and I was getting my sunglasses out of my purse, and as I was looking up to put them on my head, Mr. Parillo was like ***leering at me***, like leaned up against that counter where you first come in, like in the lobby there's this counter, and he was leaning up against it, and ***he was just leering right at me***." (Emphasis added.) (Depo.pp.28-29.)

\* \* \*

**Ann**: "Okay. He was just looking straight at me, and he had his legs crossed, and he was leaned up, and he had his arms crossed, and he was leaned up facing those doors, and he was just -- it looked like he was waiting for me to come out, and he was just -- ***wanted me to know he was interested***. That's how I felt." (Emphasis added.) (Depo.p.29.)

\* \* \*

**Ann**: "To me, ***it was improper because*** he didn't -- he wasn't looking at me because he was looking at me. ***He was looking at me to send a message***. That's my problem." (Depo.p.30.)

3.) **On August 7, 2013**, Ann was on her way to the restroom when she saw Parillo in the lobby.

**Ann**: "As I left the rink [for the restroom], Mike Mankowski was walking with his skates on through the lobby toward the rink. Following him some distance behind was Nick Parillo. He [Parillo] was not dressed for skating lessons nor did he have his skates on, however he looked as though he was heading for the rink. ***When he saw me he gave a big smile and walked toward me. I walked in a manner so as to obviously avoid him. He looked rather surprised and confused***, and started to turn around the way I was walking, took a couple steps, and then stopped. I went to the bathroom and when I returned to the rink Nick Parillo was gone. He had no private lessons that day while I was there and I did not see him again that day. I thought he had gotten the hint and when we returned in the fall to the house [non-travel] league that there would be no further problems. the incidents did bother me though and ***I did tell my husband*** about them with the caveat that I felt the situation had been taken care of. My husband was not happy about this situation, but felt that I had taken care of it." (Emphasis added.) (Ann's Statement p.3.)

4.) **On October 4, 2013**, Ann was sitting on a bench in the lobby waiting for Ray and Max. (Depo.p.39-41.)

18.

**Ann**: " * * *. While I was waiting, I noticed [Harold St. John, another Tam-O-Shanter employee] was looking down to the ground and then back up at me repeatedly. He was not speaking only looking. We even made eye contact for a brief moment. * * *. I was confused about him constantly looking in rapid secession [sic] about 4 times at me until I saw Nick Parillo near him. Nick Parillo was next to [St. John] and I assume telling [St. John] something about me. I was confused and a little concerned, but then my son and husband came out and we departed Tamo. I tried to just brush this off." (Ann's Statement p.3.)

5.) **On November 22, 2013**, Ann and her daughter were standing in the lobby.
**Ann**: "* * * Parillo was standing right in the middle of that hallway, and he was ***staring right at me.***

Q: "For how long"

**Ann**: "We actually made eye contact that time, and I eventually broke contact. It was a long -- it was a long eye contact.

Q: "So, ***you looked back at Mr. Parillo***?

**Ann**: "Yes, I did. We did make eye -- we did make direct eye contact.

* * *

Q: "And then what happened next?

**Ann:** "Well, I thought he was going to look away, but he didn't, so I looked away, and then I decided that I wasn't going to look over to that side at all, so I just didn't look over there." (Emphasis added.) (Depo.pp.48-49.)

6.) **December 2013 - January 2014**, "Ann noticed Parillo ***continuing to leer at her relentlessly*** while she was in the building in an ***attempt to make sexual advances***."

(Emphasis added.) (Oppo. to Parillo Brief p.7.)

**Ann**: "* * * During this time period I began to increasingly worry about how this would affect my young son with his hockey as he was really taking hockey more seriously and it was really important to him. As a mom the idea that this would affect him at all broke my heart. The only time when I saw Nick Parillo that he did not look at me or attempt to make eye contact was when my husband was directly with me." (Ann's Statement p.5.)

19.

7.) **On February 14, 2014**, Ann was sitting near the small rink watching Max's lesson with coach Waddell. (Oppo.Brief p.7.) "Parillo walked through a small hallway adjacent to the waiting area and saw Ann. He seemed surprised to see her. * * * . Parillo left the area only to return holding a box. This time, ***Parillo made it a point to stop, turn around and <u>leer and for an extended period of time</u>*** directly at Ann. * * *. Ann felt that Parillo wanted her to know he was looking at her." (Emphasis added.) (Oppo. to Parillo Brief pp.7-8, citing Depo.pp.65-68.)

8.) **On March 28, 2014**, Ann recalls:

"* * * [M]y family attended Max's house league playoff game. My husband and son went into the rink to get dressed for the game. My daughter and I sat in the blue chairs outside of Rink Two and were playing with stickers and coloring books staying warm until the game started. As we sat there Mr. Parillo walked into the lobby from Rink Two, with his skates on carrying a box of supplies in his arms. Parillo stopped and stood still with his back toward me for at least ten seconds. He then looked to purposely drop a puck on the floor in front of him. He slowly nudged the puck with his skate blade under the nearby bench lined up on the wall. Instead of picking it up he left it there, and then proceeded to walk away toward the hockey office. Shortly afterwards, Parillo returned to the area without his skates on or the box of supplies to retrieve the puck. While bending over to pick up the puck, he moved his head rapidly around in a blatant and ***desperate attempt to make eye contact*** with me. I avoided direct eye contact with Parillo and continued to focus on my daughter and he left the area." (Emphasis added.) (Ann's Statement pp.5-6.)

9.) **On March 28. 2014**, Ann brought Max to a lesson scheduled with coach Waddell; unknown to Ann, Waddell had cancelled Max's lesson without notice; Parillo was on the ice with another lesson. (Oppo. to Parillo Brief p.8, citing Ann's Statement p.6.) Parillo left the ice, and Ann avoided eye contact. A short time later, he "came * * * over * * * and approached [Ann] and said 'You're here for [Waddell], right?'" Ann nodded and continued to

20.

get Max ready for the Waddell lesson, not yet knowing it was cancelled. Parillo walked away without notifying Ann of the cancellation.

> **Ann:** "His demeanor was very strange and gave me anxiety. He seemed agitated. He didn't seem right. I was angry with him for what he had been doing to me but I was also apprehensive." (Ann's Statement p.6.) (*And see* Depo.p.75 ["He looked -- he was very strange. He looked -- kind of ***looked agitated***. He looked ***upset***. He looked ***a little bit pissed***. He just -- it was weird. He looked -- it was strange"].)

After learning Waddell would not be coming, another mother asked Parillo if Max and her son could join Parillo's next class, and he agreed. Ann had no further contact with Parillo that day.

> **Ann:** "I was very puzzled by why Parillo would go out of his way to seek me out and ask me if I was there for [Waddell] and then not tell me [he] wasn't there. I was sure that he had negative feelings now about me because of his demeanor that day and that my worst fear was happening right at the time Max was going to start play on the Spring Travel [hockey overseen by Parillo]." (Ann's Statement p.7.)

10.) **On March 30, 2014**, Ann sent Parillo an email to thank him for allowing Max to join the lesson. "Nick, thanks for letting Max and the other boys do your class on Friday [March 28] when Mark didn't show up! Max got a great workout! Ann." (Motion Brief Exh.11.)

> Q: "Why did you send this email?"
>
> **Ann**: "Because I thought he was angry, and I thought it would make it so he wasn't."
>
> Q: "Why -- why did you think he was angry?"
>
> **Ann**: "He seemed -- he seemed that -- that was his demeanor on the March 28th. He seemed frustrated. He seemed -- that's just my interpretation of how he was acting on that day. That's how I felt."
>
> * * *
> Q: So, you thought he was angry, and you sent this [email] to -- why?"

21.

**Ann**: "I just thought it could -- like I felt like he was getting frustrated with me, and I just -- I thought if I sent this, then like it would just -- like everything would be okay * * *." (Depo.pp.89-90.)

11.) **On April 1, 2014**, Parillo sent a response to Ann's March 30 email: "Anytime Ann. Thank you!" (Motion Brief Exh.11.) Ray had follow-up email(s) with Parillo to discuss Max taking recommended training classes with Parillo. (Oppo.Brief p.9.) Parillo did not respond to Ray's messaging. (*Id.*) "Ann and Ray agreed that Ann would not go to the facility alone" thereafter. (*Id.*)

12.) **On April 15, 2014**, Ray went to speak to Parillo in person ostensibly to discuss the training class, but with the primary, and undisclosed, purpose of letting Parillo know who Ann's husband was. (Oppo. to Parillo Brief pp9-10.) Max, however, did not attend the class because Ray was unavailable to transport Max that day. (*Id.*)

13.) **A Short Time Later**, Parillo, made it a priority to invite Max to a class the next week. (*Id.*) The plaintiffs suspect that Parillo was hoping to see Ann again. (*Id.*)

**Notification:** **On May 5, 2014**, ten months after Ann first noticed Parillo "flirting," and nine months after Ann told Ray about it, Ray notified Parillo's supervisor, defendant Mankowski, about Parillo "staring" at Ann and how the staring "made her feel uncomfortable." (4.13.15.Ray.Depo.p.71.)

### 2. R.C. 4112.02(G) Legal Standard
Sub-section (G) reads in pertinent part as follows:

It shall be an unlawful discriminatory practice: * * *

22.

(G)  For any **proprietor or any employee, keeper, or manager** of a **place of public accommodation to deny to any person**, except for reasons applicable alike to all persons regardless of race, color, religion, sex, military status, national origin, disability, age, or ancestry* * * **the full enjoyment** of the accommodations, advantages, facilities, or privileges of the place of public accommodation.  (Emphasis added.)

"The thrust of the statute, by its terms, is the comparability of treatment.  **Any denial of enjoyment of services** must be applicable to all persons."  (Emphasis added.)  *Meyers v. Hot Bagels Factory*, 131 Ohio App.3d 82, 103, 721 N.E.2d 1068 (1999), quoted by *Derungs v. Wal-Mart Stores, Inc.*, 374 F.3d 428, 431 (Cir.6, 2004).

In these "public accommodations" provisions, "the General Assembly enunciated its purpose that illegal discrimination in places of public accommodation be totally **and finally eradicated,** to the end that full enjoyment of such places be available to all persons, regardless of race, color, religion[, sex], national origin or ancestry."  (Emphasis added.)  *Ohio Civil Rights Com. v. Lysyj*, 38 Ohio St.2d 217, 219, 313 N.E.2d 3 (1974).  Thus, Ohio courts are to construe these provisions "**liberally**" to effectuate this legislative purpose.  (Emphasis added.)  *Id.* at 220.  *And see Derungs*, at 433, citing *Lysyj*, 38 Ohio St.2d at 220 (1974)   According to the Supreme Court of Ohio, the test for unlawful discrimination under R.C. 4112.02(G) "is simply whether the proprietor, keeper, manager, or employee of a place of public accommodation has **denied to any person the full enjoyment** of such place **for reasons not applicable alike to all persons** irrespective of race, color, religion, [**sex**, military status] national origin, [disability, age,] or ancestry."  (Emphasis added.)  *Lysyj*, 38 Ohio St.2d at 221 (bracketed characteristics now are part of the statute).  By its terms, sub-section (G) protects any person from unlawful

23.

discrimination by both a proprietor/manager of a facility and an employee. *Hughes v. Miller*, 181 Ohio App.3d 440, 2009-Ohio-963, 909 N.E.2d 642, at ¶40.

As a general proposition, the standard for sexual-harassment liability under the public-accommodation statute, R.C. 4112.02(G), shares the basis for liability under the sister provision contained in R.C. 4112.02(A) for claims of sexual-harassment liability in the **employment setting**. *See Miller*, at ¶¶40-49 (using the determination of sexual-harassment liability, under sub-section [A], to conclude that the claimant -- who had been successful in a sub-section [A] claim against the respondent -- had also stated a claim for sexual-harassment liability under sub-section [G]). A violation of sub-section (A) can serve as a violation of sub-section (G). See i*d.*

The *Miller* court noted that an employer may be liable under R.C. 4112.02(A) for failing to take corrective action in response to an employee's sexual harassment of a co-worker just as though the employer itself had engaged in discrimination based on sex. *Miller* at ¶34. The Miller court stated the elements for such a claim as follows:

> The court in [*Hampel v. Food Ingredients Specialties, Inc.*, 89 Ohio St.3d 169, 2000-Ohio-128, 729 N.E.2d 726] established [the] following ***elements for a hostile-environment sexual-harassment claim***: "(1) that the harassment was ***unwelcome***, (2) that the harassment was ***based on sex***, (3) that the harassing conduct was sufficiently ***severe or pervasive*** to affect the terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment, and (4) that either (a) the harassment was committed by a supervisor, or (b) ***the employer through its agents or supervisory personnel, knew or should have known of the harassment and failed to take immediate and appropriate corrective action.***" (Last emphasized item sic, and other emphasized items added.) *Miller* at ¶34.

24.

*And* see *Kilgore v. Ethicon Endo-Surgery, Inc.*, 172 Ohio App.3d 387, 2007-Ohio-2952, 875

N.E.2d 113 (same). Additionally:

> * * * *not all workplace conduct that can be construed as having sexual overtones can be characterized as harassment forbidden by the statute*. Rather, the conduct complained of must be severe or pervasive enough to *create an environment not only that the victim subjectively regards as abusive* but also that *a reasonable person would find hostile or abusive*. Under this standard, conduct that is <u>*merely offensive* *is not actionable*</u>. (Emphasis added.) *Kilgore* at ¶25.

The *Miller* court noted that these four elements of a hostile-work-environment claim apply

expressly to *employer* liability. *Miller* at ¶40. Additionally, the court implied that these

elements aid in determining the individual liability of the co-"employee" for sexual harassment.

*Id.* That court stated that, while:

> "the specific language of section 4112.02 reveals that the statutory prohibition of opposing any unlawful discriminatory practice involving sexual harassment is largely limited to the unlawful practice of an <u>*employer's discrimination*</u> on the basis of sex, or permitting sexual harassment under R.C. 4112.02(A) * * *, *in certain situations, R.C. 4112.02(G) specifically proscribes an <u>employee</u> from participating in the unlawful discriminatory practice* described in that subsection." (Emphasis added.) *Miller* at ¶40.

### 3. <u>Application</u>

Thus, in this case, the Court finds that three of the four elements of an R.C.

4112.02(A) claim are applicable to an R.C. 4112.02(G) claim that alleges wrongdoing against an

employee such as Parillo: 1.) "unwelcome harassment"; 2.) "based on sex"; and 3.) "severe or

pervasive." Obviously, the fourth element -- liability of an employer arising from "(a) the

harassment [] committed by a supervisor, or (b) the employer through its agents or supervisory

personnel, knew or should have known of the harassment and failed to take immediate and

25.

appropriate corrective action" -- would not apply here to determine whether Parillo's acts were actionable.

The defendants argue that the Pittmans' sub-section (G) claim fails to satisfy the sexual-harassment standard set forth in *Miller*. The Court notes that the second element -- "based on sex" -- *is* present here. However, the Pittmans are unable to establish the first and third prongs -- unwelcome harassment, and severe-or-pervasive harassing conduct.

**a.) First element -- "unwelcome harassment."** The Pittmans first notified the Parillo defendants, on May 5, 2014, that: (1.) Parillo was making advances -- "flirting" with or "staring" at Ann; and (2.) the advances were unwelcome -- "made her feel uncomfortable". This was ten months after Ann claims she first experienced an approach by Parillo, on July 17, 2013; she considered that incident to be sexual in nature. By the time the Pittmans notified the Parillo defendants of the Parillo's advances, the Pittmans already had decided that Ann would no longer come to Tam-O-Shanter (at least on her own), and Parillo had made no further advances. Thus, while Ann had never encouraged Parillo by indicating "she wanted [him] to make sexual advances on her," she never told him **not** to do so over the course of the ten months. Parillo testified, without contradiction, that he "wouldn't want her to be * * * uncomfortable." (Parillo Depo.p.287.) Accordingly, the Court finds the first element unsatisfied.

**b.) Third element -- "severe or pervasive."** This element "can be determined only by looking at all the circumstances[ which] may include [1.] the ***frequency*** of the discriminatory conduct; [2.] its ***severity***; [3.] whether it is ***physically threatening or humiliating***,

26.

or *a mere offensive utterance*; and [4.] whether it *unreasonably interferes* with an employee's *work performance*." (Emphasis added.) *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), cited with approval in *Kilgore v. Ethicon Endo-Surgery, Inc.*, 172 Ohio App.3d 387, 2007-Ohio-2952, 875 N.E.2d 113, at ¶26. Thus, courts find that "[*s*]*taring at someone*, without more, is generally not sufficient to create a hostile work environment." (Emphasis added.) *Kilgore*, 2007-Ohio-2952, at ¶29. *And see Mast v. IMCO Recyling of Ohio, Inc.*, 58 Fed. Appx. 116, 123 (6th Cir. 2003) ("Staring at someone, without more, is not generally sufficient to create a hostile work environment"). The conduct must be more than "following and staring"; rather it must rise to the level of being "'physically threatening or humiliating' or that the cumulative effect of this conduct "unreasonably interfere[d]'" with the plaintiff's activities." *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1248.(11th Cir.1999).

In this case, the Pittmans assert that the dozen or more occasions of "advances" made by Parillo constituted "severe or pervasive" harassment. To recap, these events consisted of Parillo doing the following:

--1.) "**flirting**" (July 17, 2013);

--2.)"**leering**" to "send [Ann] a message" (July 24, 2013);

--3.)"**smiling**," to which Ann responded by "walking in a manner so as to obviously avoid him" causing him to "look[] rather **surprised and confused**" (August 7, 2013);

--4.)"**telling** [St.John] something about" her (October4, 2013);

--5.)"**staring**," causing Ann to look away (November 22, 2013):

--6.)"**continuing to leer at her relentlessly**" (December 2013 - January 2014);

--7.)"**leer**[ing] **for an extended period of time**" (February 14, 2014);

27.

--8.) making a "**desperate attempt to make eye contact**" (March 18, 2014);

--9.) looking "**upset**," "**agitated**," "**a little bit pissed**,"

and, thereafter, failed to tell her of the cancellation of Max's lesson by another coach,

and, then, nonetheless, Parillo allowed Max to join a class Parillo was teaching (March 28, 2014);

--10. & 11.) *responding* to Ann's email -- "**thank you** [**for teaching Max**]" -- (of March 30, 2014) with an email of "**Anytime Ann.  Thank you**!" (April 1, 2014);

--12.) *meeting with Ray* in order for Ray to **discuss hockey lessons** for Max -- Ray did not mention the "advances" nor Ann's discomfort (April 15, 2014).

The Court, however, finds as a matter of law that these events -- *e.g.,* flirting, staring, leering, talking-about -- are insufficient to be deemed either "severe" as individual incidents of sexual harassment by Parillo, or even "threatening" and "frequent" as a conglomeration; thus, the incidents did not amount to a sexually hostile environment.  *See Kilgore*, 2007-Ohio-2952, at ¶29.  *And see Mast v. IMCO Recyling of Ohio, Inc.*, 58 Fed. Appx. 116, 123 (6th Cir. 2003); *Mendoza v. Borden, Inc.*, 195 F.3d 1238 (11th Cir.1999).  This finding is bolstered by the fact that the Pittmans continued to ask for and/or accept Parillo's professional help for Max in the last three events -- March 28 through April 15.  The last three incidents indicate that neither of the Pittmans were unable to interact with Parillo and/or Tam-O-Shanter (*i.e.,* their "work performance" was not "unreasonably interfere[d] with").  *See Harris*, 510 U.S. at 23.

**c.)  Alternate Third element -- "safe and wholesome."**  The Pittmans argue that the Court's finding, in the January 2015 Entry, that the Parillo defendants have a duty to provide a "safe and wholesome" environment at Tam-O-Shanter should be substituted for the

28.

"servere or pervasive" element in the sexual-harassment calculus. The Court has concluded that **an employee** of Tam-O-Shanter has a duty to take reasonable steps to ensure a safe and wholesome environment to the patrons -- that is "full enjoyment". Once an employee has denied full enjoyment of a parent by sexually harassing that parent, upon the parent reporting the sexual harassment and expressing concern about possible retaliation against the parent's children and/or family, then **Tam-O-Shanter, and its employees**, have a duty to reassure the parent and family that the employer will not allow retaliation to result from the reporting of the harassment.

The Pittmans argue that **Parillo** continued to "leer" and "stare" at Ann after the initial "flirting" incident despite Ann attempting to send him a message of disinterest in a sexual affair -- by her actions and avoidance. Parillo has testified that he did not want to make Ann feel uncomfortable. Indeed, Parillo had cordial and task-oriented conversations and emails with both Pittmans in late-March/early-April. Ann never told Parillo that his "staring" and/or "leering" made her uncomfortable. Obviously, after Ray notifyed Mankowski, no further alleged sexual harassment occurred. Further, both Mankowski and Spinazze expressly told the Pittmans that Max would be treated fairly; the Pittmans, however, did not interpret these plain and clear statements as reassurance of fair-treatment.

Thus, from the totality of circumstances, the Court finds as a matter of law that a reasonable fact finder could only conclude that the conditions were neither unsafe nor unwholesome for a family to continue to have their child engage in recreational, competitive hockey training at Tam-O-Shanter. Accordingly, the Court will grant summary judgment on this claim.

29.

Additionally, the Court also notes that the Pittmans make an R.C. 4112.02(G), public-accommodation claim against the Spinazze defendants. However, the statute prohibits only a " proprietor or any employee, keeper, or manager of a place of public accommodation" from interfering with full enjoyment. The Spinazze defendants are not any of these categories, but instead are private, contracting counsel. The failure of the General Assembly to include such a category, when it could have, indicates that the category "outside counsel" is not covered by sub-section (G). *See Myers v. Toledo*, 110 Ohio St.3d 218, 2006-Ohio-4353, 852 N.E.2d 1176, at ¶24 ("[t]he canon expressio unius est exclusio alterius tells us that the express inclusion of one thing implies the exclusion of the other"). Thus, the Court concludes as a matter of law that the Pittmans cannot establish this claim against the Spinazze defendants.

## B. COUNT TWO -- R.C. 4112.02(I) RETALIATION STATUTE

### 1. R.C. 4112.02(I) Legal Standard

R.C. 4112.02(I) reads as follows:

It shall be an unlawful discriminatory practice:  * * *

(I)  For any person to discriminate in any manner against any other person [1.] because that person has **opposed** any **unlawful discriminatory practice** defined in this section or [2.] because that person has **made a charge**, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code.  (Emphasis added.)

To set forth "a prima facie case * * * for retaliation [arising from the claimant's] participation in a protected activity under R.C. 4112.02(I), [the claimant's] pleading must sufficiently set forth facts establishing the following *four elements*: (1) claimant engaged in a *protected activity*; (2) claimant's engagement in the protected *activity was known* to the

opposing party; (3) the opposing party thereafter took **adverse action against the claimant**; and, (4) there exists **a causal connection** between the protected activity and the adverse action." (Emphasis added.) *Hughes v. Miller*, 181 Ohio App.3d 440, at ¶29. *And see Baker v. City of Toledo,* N.D.Oh. No. 3:05 CV 7315, 2007 U.S. Dist. LEXIS 26795 (Apr. 11, 2007).

The parties in this case have cited to legal authority from employment discrimination cases. In the employment context, an employee communicating her belief that the employer has engaged in discriminatory conduct is sufficient to constitute "protected activity." *Robinson v. Quasar Energy Group LLC*, 8th Dist. No. 101062, 2014-Ohio-4218, at ¶19. The claimant properly may seek protection from retaliation "regardless of whether the conduct * * * was in fact unlawful." *Id.* at ¶20.

However, "[a]n individual is **not protected from <u>all</u> retaliation** [under R.C. 4112.02(I)], but only 'from retaliation that causes **injury or harm**.'" (Emphasis added.) *Baker v. City of Toledo*, supra, 2007 U.S. Dist. LEXIS 26795, *18, quoting *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 67, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). Courts are to evaluate the harm of the alleged retaliatory act "objectively, and consider the action in light of the particular circumstances of the case." *Baker* at *18.

> Defendant takes an **adverse retaliatory action** when a "reasonable employee would have found the challenged action **materially adverse**, 'which in this context means it **well might have dissuaded a reasonable worker from making or supporting a charge of discrimination**.'" *Burlington Northern & Santa Fe Ry. v. White*, 126 S. Ct. 2405, 2415, 165 L. Ed. 2d 345 (2006). An individual is not protected from all retaliation, but only "from retaliation that causes **injury or harm**." *Id*. at 2414. When evaluating an alleged adverse retaliatory action, the Court should evaluate the action's harm **objectively**, and consider the action in light of the particular circumstances of the case, as **some acts**

31.

*would be material in one case but immaterial in another*. * * *. "By *focusing on the materiality of the challenged action and the perspective of a reasonable person in the plaintiff's position, we believe this standard will* <u>*screen out trivial conduct*</u> *while* <u>*effectively capturing those acts that are likely to dissuade employees*</u> from complaining or assisting in complaints about discrimination." (Citations omitted; emphasis added.) *Baker* at*18-19.

Thus, "adverse employment actions [are those that] materially affect the terms and conditions of her employment." *Baker* at*22. "However, ***simple teasing, offhand comments, occasional offensive utterances***, and other isolated incidents, ***unless extremely serious***, ***do not*** rise to the level required to ***create a hostile work environment***." (Emphasis added.) *Campbell v. Norfolk S. Corp*., 876 F. Supp. 2d 967, 980 (N.D.Oh.2012). *And see Cecil v. Louisville Water Co.*, 301 Fed. Appx. 490, 2008 U.S.App. LEXIS24230, *26-27 (Cir.6 Nov. 24, 2008) ("A materially adverse action does not include trivial harms, such as 'petty slights or minor annoyances that often take place at work and that all employees experience'".) Id.

### 2. Alleged Incidents of Retaliation

The Pittmans expressly discuss these following incidents of alleged retaliation in their Opposition and Sur-Reply briefs, and the defendants have addressed them as well in briefs.

### a. Parillo Defendants:[3]:

1.) "Mankowski's threatening email the evening of 5/6/14": On May, 6, 2014, Mankowski sent an email to the Pittmans. (Complaint para.88.c.); see Motion Exh.23 [the email].) In it he: invited the Pittmans to "continue to participate in our programs in the future"; stated that, while the tryout process was "subjective," Max would be "given every opportunity to make the travel team"; indicated that the Pittmans should "not feel obligated to

---

[3] These events are referenced at Oppo. to Parillo Brief pp.30, 32-33.

32.

attend a [Tam-O-Shanter] Clinic" because attendance is not a "requirement to make any team"; and stated "any potential issues with [Parillo were] taken care of [because] this was a misunderstanding -- even though Mankowski was incorrect when he observed that Parillo "did not know who Mrs. Pittman was when I approached him on the subject [on May 5]."

2.) "Parillo's 5/7/14 email to Ann from Nikki Parillo's email account":  On May 7, 2014, Nikki Parillo sent an email to Ann.  (Complaint Exh.C.)  The Pittmans believe that Parillo, and not Nikki Parillo, sent the email in an attempt to intimidate the Pittmans.  The email: i.) introduces Nikki and mentions Ann's accusations (1st para.); ii.) expresses that the Parillos do not believe the accusations (2d para.); iii.) discusses the Parillos' feelings of being threatened unjustly by the Pittmans (3d para.); iv.) professes that no evidence supports the accusations; v.) and concludes with the following two paragraphs:

> We deserve to know why you feel this way and this needs to be put to rest right away and dealt with like adults before anyone else  gets hurt or misunderstood.  And as far as a slw suit goes ....really?  Wow.  Way to over react to something that never happened.

> You may or may not respond to this, you may give it to the "lawyer."  Suit yourself, but a decent person would handle this situation in a respectful manner for all of those involved.
> Kindly, Nikki Parillo.

3.) "Parillo's and Cline's intimidation of Ray on 5/13/14":  The Pittmans allege that Cline, a Tam-O-Shanter employee, made an allegedly intimidating comment to Ray:  "if a guy has a problem with you, he should take it up with your and not your wife."[4]

4.) "Parillo's attempt to create a confrontation between Nikki and Ann on 5/18/14":  "Parillo was hoping to evoke some sort of confrontation between [them at a hockey tournament in order to] intimidate Ann into dropping her internal complaint made to Tam-O-Shanter."  (*Id*.)

5.) "Parillo's 'protocol' of evaluating Max which was more of [a] stalking indicent":  Parillo gave as one reason for his being at the tournament was to assess Max's playing ability.  (*Id.*)

6.) "The actions of [board member] Ted Leslie and his wife to destroy the confidentiality of Ann's internal complaint to Mankowski and Spinazze prior to filing of this lawsuit":  Ted and Monica allegedly told others of the friends about the Pittmans' allegations against Parillo before the Pittmans had filed the action.

7.) Mick Malone told Coach Chan about the lawsuit.

---

[4] Oppo. to Parillo Brief p.30.)

33.

8.)  On April 6, 2015, Tam-O-Shanter employee Harold St. John and two others "stared down" Ray and Max in the locker room for five to ten minutes which was "very disturbing" to Ray.  (*Id*.)

9.)  In the Spring of 2015, two volunteer Tam-O-Shanter coaches would not allow Max to attend practice unless the Pittmans signed a "releas[e] of all claims" which would give the Pittmans' permission for the volunteers to coach Max.  (*Id.*)

10.)  Parillo, Mankowski, and their trial counsel were in contact with Coach Chan in order to make false claims and "stating negative things about" Ray.

11.)  The defendants have intermittently removed the Pittmans from mailing lists.  (*Id.*)

12.)  Ted Leslie told a Sylvania Township Trustee that the Pittmans had filed a frivolous bullying complaint at St. Joe's in order to influence the trustee not to aid in the Pittman's prosecution with this case.  (*Id.*)

**b. Spinazze Defendants.**

Spinazze, Parillo and Mankowski together "formulated" the allegedly retaliatory email, of May 7, 2014, sent to Ann which the disguised as coming from Nikki Parillo.

**c. Malones.**

The Pittmans assert that the Malones have retaliated against the Pittmans because of the Pittmans' allegations of public-accommodation sexual-harassment by the Parillo defendants; the Pittmans believe the Malones were attempting to ruin the Pittmans' reputations at St. Joe's, at FAHA, and (by inference) at Tam-O-Shanter.  The Pittmans allege that Mick was a coach at Tam-O-Shanter at all times relevant.  (Malone Complaint para.11.)  Mick had been a volunteer coach for his son's Tam-O-Shanter team coached by Coach Chan, but Mick has never been an employee of the facility; and, Mick was not a volunteer coach in June 2014 when the Pittmans filed their original complaint.  (See Mick Affid.para.5.)

34.

**1.) MALONES LEARNED OF SUIT.** The Malones learned of the Pittmans' original complaint from Julie's friend Sue Dejardins shortly after the Pittmans filed it on June 19, 2014; Sue had learned of the suit from another friend, Pam Sanford, and then looked up the case on-line; Sue's husband helped Sue forward the complaint (and the attached Ann's Statement) to the Malones because they were "friends." (S.Dejardins Depo.pp.22-23.) Sue and Julie viewed this sharing as "gossip" between friends. (Julie Depo.p.48.) When Sue first read the complaint documents, she did not believe there had been sexual harassment by Parillo; Sue believed Ann's claims were "kind of crazy"; from reading the documents Sue believed that Ann had been leering at Parillo. (S.Dejardins Depo.pp.9-11,22-23.) When Julie read the documents, she thought the claims were "ridiculous." (Julie Affid.para.8.)

**2.) MICK MALONE TO COACH CHAN**. On or about June 24, 2014, Mick emailed a copy of the Pittman's original complaint which also contained Ann's Statement, to Coach Chan. (Mick Affid.paras.9-10.) At that time, the Pittman's son, Max, was playing travel hockey at FAHA for the 2014-2105 season. The Pittmans assert the Malones hoped to interfere with the Pittmans use of and experience at FAHA.

(a.) **Mick contends**: Mick shared the complaint and statement to protect Chan, and to make Chan aware of potential difficulties with the Pittmans.

(b.) **Coach Chan was uncomfortable**: Coach Chan knew of the Pittmans because Chan's son also belonged to St. Joe's school; Coach Chan had heard from someone that Ann had raised a concern with St. Joe's about air-conditioning there, thus he inferred some volatility on their part. (Chan Depo.pp.66,171-172.) Coach Chan felt uncomfortable with the Pittmans in part because of this case. (Chan Depo.pp.148-151.) Additionally, however, Ray had

35.

complained to Coach Chan on more than one occasion about Max's lack-of-playing time; thus, he experienced Ray to be "hostile." (Chan Depo.pp.121,423-424.) On one occasion, Ray had been "very angry." (Chan Depo.p.177.)

(c.) **Coach Chan and FAHA**. The Pittmans believe that, as a result of Mick sharing the documents with Coach Chan, the coach: i.) ostracized Ann; ii.) refused to allow Ray to serve as a volunteer team manager for Max's team; and iii.) cut Max from the Spring 2015 FAHA travel hockey team without merit.

i.) **ostracized**: Ann asserts that Coach Chan acted distant toward Ann and was "never alone" with Ann; she believes this was unique to her alone. Coach Chan testified, without contradiction, that he was not alone with a lot of parents, he did not want to be alone with Ann, and he, however, did not treat Ann differently than other parents. (Chan Depo.pp.150-151.)

ii.) **volunteer manager**: Ray volunteered to be parent-manager for son's team at a point in time when other parents were not volunteering. Ray contends that Coach Chan refused Ray's offer because of the instant law suit. (Chan Depo.pp.214-215.) The coach states that he did not flatly refuse Ray. (Chan Depo.pp.420-421.) Coach Chan recalls that U.S. Hockey had begun to require "screening" of volunteers, which Ray did not have; another parent who had been screened eventually did then agree to serve. (*Id.*)

iii.) **cutting Max**: The Pittmans assert that: Coach Chan cut Max from the 2015 travel team without merit; Max was the last player to be cut; and the coach had trimmed the team roster from 16 in the 2014-2015 season to 13 in the 2015 season as a pretext; Coach Chan did this to eliminate Max. Coach Chan testified that members of the FAHA board evaluated player-candidates by giving each a number score. (Chan Depo.pp.343-351.) And, he, Chan, did not evaluate Max. (Chan Depo.pp.350-351.) Nonetheless, the coaches had discretion to deviate from the rankings. (Chan Depo.pp.342-351.) Coach Chan also admitted that if a coach had a problem with a parent, that fact could impact on the travel team assignments. (Chan Depo.182.)

**3. JULIE MALONE WITH FRIENDS**. The Pittmans assert that Julie spread information about their suit against the Parillo defendants with "others" in the St. Joe's community. They offer no testimony indicating that Julie shared with anyone other than the friends. However, as among the Malones, and their friends, (Sue and Dave Desjardins, Toby

36.

and Tracy McCanna, Tracy and Troy Roscoe, Ted and Monica Leslie, Pam Sanford, Amy Mallek) there **was** discussion and "gossip" about the Pittmans. (See Tracy Roscoe Depo.pp.9-14; J.Malone Depo.pp.18-19,35-39,49,54-55,65,72-73.) The friends testified to "rumors" that the Pittmans had threatened suits or made complaints against St. Joe's. (Julie Depo.pp.35-38, 44-45.) Some believed that Ann's Statement was "fantasy." (Julie Depo.p.55.) The testimony of the friends agree that they heard about the suit from one another and had limited conversations about it; they, possibly, had mentioned among themselves rumors of other suits threatened by the Pittmans. (See Dejardins Depo.pp.9-11,14-16,22-23,30,34; McCanna Depo.p.12; Leslie Depo.9-12,32.)

**Photo of Max**. Julie emailed a photo to Sue Dejardins; the photo was of Sue's daughter, Max, and Julie's daughter. In the photo, Max was looking at the two girls. Recalling that Sue had told Julie that Sue believed Ann probably had leered at Parillo, Julie jokingly captioned the photo "must run in the family." (Dejardins Depo.pp.9-11.) Sue believed that Julie was making a "joke." (Id.)

### 4. Conclusion -- All Defendants:

The Court is to assess the actionability of these allegations of retaliation: 1.) "in light of the particular circumstances of [this] case," and 2.) "objectively." *Baker v. City of Toledo*, supra, 2007 U.S. Dist. LEXIS 26795 at *18.

**Particular circumstances.** First, the Court notes that this is a voluntary recreational situation, it is not an employment situation. The facility is open to families who chose to pay the fees associated with involvement. The Pittmans face no loss of livelihood from the allegedly harmful acts of the defendants. Thus, the Court finds that this particular situation

37.

does not implicate the Pittmans' safety nor even their life style; this is a situation involving where the Pittmans chose to expend their family's discretionary resources.

**Objectively.** Second, the Court finds that reasonable minds could only conclude that the alleged individual actions of all the defendants and the relevant friends and acquaintances -- some actions being petty, rude, offensive, off-putting, and not Christian -- are not materially adverse. Such behavior by the defendants and the friends is not such that would dissuade a reasonable person to forego pursuing a meritorious action for harassment and/or discrimination. Indeed, the Pittmans have remained remarkably undaunted throughout.

Based on the foregoing, the Court concludes the defendants are entitled to judgment as a matter of law on this claim.

### C.  COUNT THREE -- R.C. 4112.02(J), AID AND ABET

R.C. 4112.02(J) reads as follows:

It shall be an unlawful discriminatory practice:  * * *

(J)  For any person [1.] to **aid, abet, incite, compel, or coerce** the doing of **_any act declared by this section to be an unlawful discriminatory practice_**, [2.] to **obstruct or prevent** any person from complying with this chapter or any order issued under it, or [3.] to **attempt directly or indirectly to commit any act** declared by this section to be an unlawful discriminatory practice.  ("Emphasis added.)

In the January 2015 Entry, the Court already has observed that the language of sub-section (J) bases a person's liability on actually "facilitat[ing]" another's active violation of R.C. 4112.02.  *See Cole v. Seafare Enters.*, 1st Dist. No. C-950157, 1996 Ohio App. LEXIS 440, *9. *And see Angel v. United Paperworkers Int'l Union Local 1967*, Case No. C-1-01-467, 2003 U.S. Dist. LEXIS 3668 (S.D.Oh. Mar. 10, 2003), *46 (interpreting the "aid, abet" provisionS of the

38.

statute as taking-a-part-in a wrongful act in order to trigger being "held accountable under [R.C.] 4112.02(J)").

> [If a] plaintiff has not established the elements of her sexual discrimination and sexual harassment claims, [then] her claim for aiding and abetting sexual harassment under Ohio law also fails.. *Woolf v. City of Streetsboro*, N.D.Oh. No. 5:09 CV 15702010, U.S. Dist. LEXIS 110446 (Oct. 18, 2010) *48.

The defendants accurately observe that they did not actively participate in, or otherwise facilitate, any sexual harassment of Ann by Parillo, and, because of this, they are not subject to liability under sub-section (J). The Court agrees. The Court finds that the defendants are entitled to judgment as a matter of law on this count.

### D.  COUNT FOUR -- CIVIL CONSPIRACY

In order to state a claim for civil conspiracy, a plaintiff must allege facts to support the existence of "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *Kenty v. Transamerica Premium Ins. Co.*, 72 Ohio St.3d 415, 650 N.E.2d 863 (1995). Ohio courts require "an underlying ***unlawful act***" for a plaintiff to succeed. (Emphasis added.) *Williams v. Aetna Fin. Co.*, 83 Ohio St.3d 464, 475, 700 N.E.2d 859 (1998).

In this case, the Court has determined that the plaintiffs have failed to state a claim under R.C. 4112.02(G), (I), and (J). Each claim is, as set forth in the statute, "an ***unlawful*** discriminatory act." (Emphasis added.) R.C. 4112.02. Accordingly, as a matter of law, the Court finds that this count also fails to state a claim upon which relief can be granted.

### E.  COUNT EIGHT -- PRELIMINARY/PERMANENT INJUNCTION

39.

When "determining whether to issue a preliminary injunction, the court must consider (1) whether the movant has established a **substantial likelihood of success on the merits**; (2) the **irreparable harm** that could result to the movant if the injunction is not issued; (3) the possibility of **substantial harm to others** if the injunction is issued; and (4) whether the **public interest** would be served by issuing the injunction." (Emphasis added.) *Cousins v. Bray*, 297 F. Supp.2d 1027, 1037 (S.D.Oh.2003). Courts do issue preliminary injunctions in appropriate cases brought under R.C. 4112.02 if the four factors cited above implicate such relief. *See id.* at 1042 (all four factors militate in favor of preliminary injunctive relief).

In this case the defendants argue that the plaintiffs have not stated a claim because the Pittmans have failed to establish an underlying claim. The Court agrees. Now, at this juncture, the Court finds no meritorious claim for preliminary or permanent injunctive relief, and, thus, the defendants are entitled to judgment as a matter of law.

### F. COUNT NINE -- DECLARATORY JUDGMENT

The Pittmans seek a declaratory judgment that they are protected in all ways relevant in this case by R.C. 4112.02(G), (I), and (J).

> Subject to division (B) of section 2721.02 of the Revised Code * * * any person whose rights, status, or other legal relations are affected by a * * * statute * * * may have determined any question of construction or validity arising under the * * * statute * * * or other legal relations under it. R.C. 2721.03.

In order to demonstrate a plaintiff has a right to declaratory relief, she must establish: "(1) a real controversy exists between the parties, (2) the controversy is justiciable in character, and (3) speedy relief is necessary to preserve the rights of the parties." *Victory Acad. of Toledo v. Zelman*, 10th Dist. No. 07AP-1067 , 2008-Ohio-3561, *quoting  Aust v. Ohio State Dental Bd,* 136

40.

Ohio App.3d 677, 681, 737 N.E.2d 605 (2000). "R.C. 2721.03 provides that a party whose **rights are affected by a statute** or rule may bring an action to, '* * * **determine[] any question of construction or validity** arising under * * *' such statute or rule. The essence of the proceeding is a determination of construction or validity." (Emphasis added.) *Kim's Auto & Truck Serv. v. City of Toledo*, 172 Ohio App.3d 1, 2007-Ohio-2260, 872 N.E.2d 1245, at ¶15.

In this case. the Pittmans seek a legal determination as to the applicability of R.C. 4112.02(G), (I), and (J), in relation to facts as alleged and asserted by the Pittmans. Based on the foregoing, the Court will grant the defendants' motions for summary judgment on this claim.

### G. COUNT FIVE, COUNT SIX, AND COUNT ELEVEN

In count five the Pittmans assert a negligence claim against Tam-O-Shanter. In count six the Pittmans assert negligence claims against both Mr. Parillo and Mr. Mankowski. In Count Eleven, the Pittmans make negligence claims against the Spinazze defendants and SDR.

However, based on the determinations above, the Court finds that reasonable minds could only conclude that the defendants have breached no duty of care owed to the Pittmans.

### IV. <u>CONCLUSION</u>

The Court has endeavored to note, to understand, and to decide carefully all issues and arguments raised by the parties. Inevitably, the Court will have missed some. That said, the Court hereby denies any and all motions which the Court has not expressly addressed in this opinion.

41.

The Court will grant judgment to all defendants as a matter of law.  This matter is now completed in this Court.

## JUDGMENT ENTRY

The Court hereby ORDERS that the following three separate motions for summary judgment are granted:  one filed by defendants Nick Parillo, Mike Mankowski, Tam-O-Shanter, Inc. and Sylvania Recreational District; another filed by defendants Anthony Spinazze and Lydy & Moan, Ltd.; and yet another filed by defendants William and Julie Malone.

The Court further ORDERS that the claims of the plaintiffs against the defendants are dismissed with prejudice.  The Court finds no just reason for delay.


_____                    _____
                                           Myron C. Duhart, Judge
DISTRIBUTION:        Raymond H. Pittman, III
                     John Smalley/Benjamin Felton
                     Gregory H. Wagoner/Rebecca E. Shope
                     James E. Brazeau/Jason M. Van Dam
                     Daniel T. Ellis
                     Robert J. Bahret